HARRY W. SWIFT, Plaintiff, v. JAMES C. DAVIS, Director-General of Railroads and Agent under Section 206 of the Transportation Act, Defendant.

Supreme Court, Ulster Trial Term, March, 1922.

Carriers — interstate commerce — bills of lading forwarded to agent of consignor instead of to consignee — straight bills of lading not marked " non-negotiable " transferable by delivery — carrier not liable upon delivery of goods to agent of consignor upon surrender of bills of lading — conversion — fraud.

Plaintiff consigned from Cleveland, O., to Kingston, N. Y., to the brother of its agent, certain goods pursuant to several orders which the agent had sent in without the knowledge or consent of his brother. The consignor mailed to its agent straight bills of lading which were not marked on their face " non-negotiable " or " not negotiable " and upon his surrender thereof to the carrier the goods called for by said bills of lading were delivered to plaintiff's agent, who receipted for them in his own name, took them away and neither he nor his brother ever paid for all of the goods. Upon dismissing the complaint in an action brought by the consignor against the carrier for the conversion or misdelivery of the goods not paid for or returned, *held*, that the bills of lading must be regarded from the standpoint of interstate commerce and that the statutory law governing carriers and bills of lading applied (Interstate Commerce Act, § 20; U. S. Laws, August 29, 1916, § 29, 39 .Stat. 543) and the bills of lading could be transferred by delivery.

There was no transfer of the property called for by the bills of lading, either to the consignee or to plaintiff's agent, and although it was a fair inference that the purpose of the committal of the bills of lading to plaintiff's agent and of the reservation of the *jus disponendi* was to secure payment for the goods, their delivery by the carrier to plaintiff's agent did not constitute a misdelivery or a conversion.

Defendant was also entitled to invoke the maxim that where one of two innocent parties must sustain a loss from the fraud of the third, such loss must fall upon the one, if either, whose act has enabled the fraud to be committed.

MOTION to dismiss complaint.

*Henry Klein* and *Van Etten & Cook* (*A. J. Cook*, of counsel), for plaintiff.

*Amos Van Etten*, for defendant.

HASBROUCK, J. The Stetson Oil Company of Cleveland, O., the name under which Harry W. Swift did business, sometime in February, 1918, employed Jonas D. B. Deyo of Rosendale as its agent to sell paints and oils. The contract of employment was in writing and provided among other things:

" Said party of the second part agrees to represent said party of the first part in the sale of their goods.

" Said party of the second part agrees to work under the direction and for the interests of the said party of the first part, and to make no·collections whatever without the written authority of the said party of the first part, but when such authority is given said party of the second part agrees to make said collection and either return it immediately to the said party of the first part, or retain it in payment of commission; this at the option of the said party of the first part."

Before February, 1918, Jonas had driven the stage for his brother, William J. Deyo, between the Rosendale station, Tillson and Rifton. In May of that year William J. Deyo gave Jonas an order for some paints and Jonas asked him for permission to have some other goods shipped with such order. This was done. The carrier selected was the West Shore Railroad Company which operates the Wallkill Valley railroad between Kingston and Rosendale. When William J. Deyo's goods arrived at·Rosendale, Jonas received them from the railroad company and signed for them. Such of them·as were William J. Deyo's were placed in the stage he ran between Rosendale and Rifton and were delivered at William J. Deyo's residence. The remainder of the order was distributed by Jonas to those to whom he had sold. Between May twenty-eighth and June twenty-fourth Jonas sent to the company six orders for goods in the name of William J. Deyo without William's knowledge or consent and the goods were consigned by the plaintiff to William J. Deyo. The bills of lading were forwarded to Jonas D. B. Deyo by mail and the goods called for by the bills of lading on their surrender were delivered to him at the railroad station. They were not transferred by indorsement. The bills were not marked on their face, " non-negotiable " or " not negotiable." They were straight bills of lading. Jonas receipted for the goods in his own name, received and placed them in the stage of William J. Deyo and carried them away from the

station. Neither William J. nor Jonas has ever paid for all the goods. The plaintiff, Harry W. Swift, has brought a suit against the West Shore Railroad Company for the conversion or misdelivery of the goods not paid for or returned.

Generally speaking a bill of lading is an agreement between a shipper and a carrier for a consideration to deliver goods at a certain place to a specified consignee. *Blanchard* v. *Page*, 8 Gray (Mass.), 281.

A bill of lading stands for goods themselves. It is, however, not like a bill of exchange or a promissory note absolute in its negotiability. It remains always subject to have the equities of its transfer revealed by evidence. Its potentiality as between them depends upon the intention of the parties. *Merchants' Exch. Bank* v. *McGraw*, 76 Fed. Rep. 930; *Pollard* v. *Vinton*, 105 U. S. 7; *Dows* v. *Nat. Exch. Bank*, 91 id. 618, 633.

If, however, the consignor retains control of the bill of lading, the *jus disponendi*, the title remains in the consignor to dispose of in accordance with his will. *Farmers & Mechanics' Nat. Bank* v. *Logan*, 74 N. Y. 568.

A bill of lading must be looked at from two angles: That of a receipt and that of a contract. When looked at as a contract the distinction made by Abbott, C. J., in *Sargent* v. *Morris*, 3 Barn. & Ald. 277, is illuminating: " A transfer of the property is, however, very different from a transfer of the contract."

In the case at bar there was no transfer of the property. There was a transfer of the bill of lading by sending it to his agent, Jonas D. B. Deyo, at Rosendale. There can be little doubt as to the purpose of such committal of the bill of lading and of the reservation of the *jus disponendi*. It was to secure payment for the goods. *Colgate* v. *Pennsylvania Co.*, 102 N. Y. 120; *Merchants' Exch. Bank* v. *McGraw*, *supra*.

At any rate it is within the power of the trial court to draw that inference. The property did not pass to the consignee. Neither did it pass to Jonas. What happened was that the owner and consignor mailed the bills of lading to Jonas and he presented and surrendered them to the carrier for the goods and they were delivered by the carrier to him. Did such delivery constitute a misdelivery and conversion in the law of plaintiff's property? That must depend upon the nature and character of a bill of lading. It must be regarded in this instance from the standpoint of interstate commerce, the carriage between Cleveland, O., and Rosendale, N. Y., being interstate.

As such commerce it must be governed by the statutory law governing carriers and regulating bills of lading. *Adams Express Co.* v. *Croninger*, 226 U. S. 491, 506.

There are two statutes of the United States to which our attention should be turned. One is what is known as the Carmack Amendment, in part embraced in what is now section 20 of the Interstate Commerce Act (U. S. Comp. Stat. 1916, § 8604a). It provides: " That any common carrier  * * *  subject to the provisions of this Act receiving property for transportation  * * * shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it," etc. *Pennsylvania R. R. Co.* v. *Olivit Bros.,* 243 U. S. 574, 582.

The other is " An act relating to bills of lading in interstate and foreign commerce " (U. S. Comp. Stat. 1916, § 8604aaa et seq.). This act distinguishes bills of lading as " straight bills " and " order bills " and provides that straight bills can be divested of negotiable character by placing plainly upon their faces " nonnegotiable " or " not negotiable." The effect of the use of such words on the bill would be to make a delivery of the property covered by them to anybody but the consignee unlawful. The bills in question were straight bills and their negotiability had not been eradicated by the use of the statutory words above mentioned.

The bills in question, therefore, were capable of being transferred by delivery. U. S. Laws, August 29, 1916, § 29, 39 Stat. 543; *Pollard* v. *Vinton, supra; Gubelman* v. *Panama R. R. Co.,* 192 App. Div. 165.

In this respect, at least, therefore, there was no change made by the statute in the common law. And it has been the long and recognized rule of the law merchant that no deliveries of property will be made by carriers without the surrender of the bills of lading describing it. *Bank of Batavia* v. *N. Y., L. E. & W. R. R. Co.,* 106 N. Y. 195.

The question, therefore, to be determined under the Interstate Commerce Law is, was the loss suffered by the consignor *caused* by the carrier? Did the carrier have the right to deliver the property to the holder of the bills of lading? There is no restraint cast upon the transferee in this respect although the statute provides that " A bill may be transferred by the holder by delivery, accompanied with an agreement, express or implied, to transfer the title to the bill or to the goods represented thereby." § 29, *supra.* That is equivalent to saying that the carrier may infer that there was an agreement made between the transferor and transferee of the title to the bill or the goods for the transfer of them and that such agreement existing it was competent for the carrier to deliver the goods upon the presentation and surrender of the bills of lading.

Recognizing the large part bills of lading play in the commerce of the country and the world it must be apparent that it would be unreasonable to require that the carrier should be charged with examining into the terms on which such bills passed before releasing a shipment.

It is plain, therefore, that if there was a loss suffered by the consignor it was not " caused by " the defendant. It is plain, if possession of the bills of lading by Jonas was lawfully acquired, that the defendant was justified in making delivery to him. *Forbes* v. *Boston & Lowell R. R. Co.*, 133 Mass. 154; *American Zinc, Lead & Smelting Co.* v. *Markle Lead Works*, 102 Mo. App. 158.

The rule is that a common carrier must not only deliver the property shipped unimpaired in amount and quality except by unavoidable causes and that it must deliver it to the right party. Indeed such carriers within the limitation above expressed are insurers.

There is no question here as to any impairment in quality or amount of the property delivered. The claim is simply that the defendant made a misdelivery and was guilty of conversion in delivering the property to the wrong party.

It is represented that Jonas having communicated to his principal a false order for the goods and having possessed the intention of appropriating them to his own use obtained no title to the bills of lading and being engaged in the perpetration of a crime in their presentation the defendant could not make a justifiable delivery to him.

It may be argued that there is support for this claim in the case of *Stephenson* v. *Hart*, 13 Eng. C. L. Rep. 596, 599. In that case Stephenson, who had been imposed upon by a swindler, consigned a box at Birmingham, Eng., by the defendants as common carriers to J. West, 27 Great Winchester street, London. Defendants found no such person residing there but upon receiving a letter signed J. West requesting that the box might be forwarded to a public house at St. Albans, they delivered it there to a person who called himself West. A motion having been made in the action for a new trial and a rule *nisi* having been granted, Mr. Justice Parks in discharging the rule, among other things, said: " A felon could not be the right person."

It seems to me that the case at bar is susceptible of being distinguished from the case of *Stephenson* v. *Hart*. There are more inferences than one to be drawn from the evidence, for the plaintiff received from Jonas Deyo after the delivery by the carrier to him

14

payments on account of these goods and received too the return of some of the goods described in the bills of lading. But if an inference that a crime had been perpetrated might be drawn there would still remain to the defendant the claim that the plaintiff is estopped by the use he made of his bills of lading. It is conceded that if the bills of lading had come into the possession of Jonas through the crime of common-law larceny, if Jonas had possessed himself of these bills over the resistance and against the will of the consignors, then there would be no room for the invocation of the principle of estoppel. Here, however, Jonas, if he obtained possession of the property criminally, did it by means of the false representation that his brother William J. had ordered the goods. His possession was not against the will of the consignor; it was with it. Under conditions not dissimilar to those prevailing in the instant case the court has held the doctrine of estoppel applicable. *Bank of Batavia* v. *N. Y., L. E. & W. R. R. Co., supra; Fisher* v. *Mechanics & Metals Nat. Bank,* 89 Misc. Rep. 587.

I think the defendant is entitled to further invoke the principle of equitable estoppel (*Pollard* v. *Reardon,* 65 Fed. Rep. 848, 850) on the basis of the legal maxim that " where one of two innocent parties must sustain a loss from the fraud of a third such loss shall fall upon the one, if either, whose act has enabled such fraud to be committed." *Fisher Case, supra; Van Duzer* v. *Howe,* 21 N. Y. 531.

Complaint dismissed, with costs.

Ordered accordingly.