MET–AL, INC., Plaintiff,

v.

HANSEN STORAGE COMPANY, Distribution Express, Inc., and Metal Brokers International, Inc., Defendants.

No. 93–C–479.
Adv. No. 92–2304.

United States District Court,
E.D. Wisconsin.

July 22, 1993.

As Amended Aug. 11, and Aug. 19, 1993.

Donald H. Carlson, Riordan, Crivello, Carlson, Mentkowski & Steeves, Milwaukee, WI, for Met–Al, Inc.

Robert K. Steuer, Davis & Kuelthau, Milwaukee, WI, for Met–Al Creditors Committee.

John F. Horvath, Horvath & Lieber, Chicago, IL and Ronald L. Piette, Piette & Jacobson, Milwaukee, WI, for Hansen Storage.

Jeffrey J. Liotta, Hinshaw & Culbertson, Milwaukee, WI, for Distribution Exp.

Mark L. Metz, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, WI, Trustee for Metal Brokers Intern.

### *ORDER*

WARREN, Senior District Judge.

The plaintiff in this adversary proceeding lost over $4 million when an unscrupulous aluminum broker set up phony transactions, diverted aluminum from the plaintiff's intended customers, and failed to pay for goods delivered. The plaintiff now claims that the carrier of the aluminum, and the warehouse in which it was stored, should be held liable for the loss based upon their failure to honor the original bills of lading. Before the Court are the parties' cross-motions for partial summary judgment.

## I. BACKGROUND

Plaintiff Met–Al, Inc. ("Met–Al") produces ingots from aluminum scrap. Metal Brokers International, Inc. ("MBI") brokers aluminum, matching producers with purchasers and facilitating their transactions. Floridians Roger and Lynn Green [1] were, respectively, the president and treasurer of MBI. Defendants Distribution Express, Inc. ("DEI") and Hansen Storage Company ("Hansen"), respectively, are a trucking company and warehouse owned by the same family. DEI's general manager and secretary/treasurer, Peter Schmit, is Hansen's secretary/treasurer as well.

In short, Green convinced Met–Al and its two shareholders, Philip Eckert and Robert

---

1. The Court will employ "Green" for Roger Green, the principal actor in the scheme.

Lee,[2] that he was an authorized broker for Emerson Electronics ("Emerson") and General Electric ("GE") when, in fact, this was not true. After the aluminum left Met–Al's place of business, ostensibly for Emerson and GE,[3] it was cross-docked at Hansen's warehouse, where Green persuaded DEI to change the original bills of lading issued to Met–Al. Once the bills were changed, MBI diverted the aluminum to other buyers and used the proceeds to pay Met–Al. Met–Al believed it was receiving payment from Emerson or GE, albeit on terms of extended credit. Before the scheme collapsed, MBI had transferred in excess of $13 million of aluminum, but had paid Met–Al only slightly more than $8 million.

Green, who had been an aluminum broker for many years, appeared to be doing regular business with Emerson and GE. He had been Met–Al's sales agent while employed with another company and, after he formed MBI, Met–Al continued to use his services. (Eckert Dep. at 15.) In September of 1991, Green scheduled a meeting with Gerald Vickery, Met–Al's sales manager. This was a reunion of sorts, as Vickery and Green had worked together at another company several years earlier. (Vickery Dep. at 26.) Also at the meeting was Allen Davis, who held himself out to be the vice president of Emerson in charge of purchasing metal and supplies for all of its facilities.[4] (Vickery Dep. at 54.) He informed Vickery that Green was going to be Emerson's agent in charge of metal procurement. (Vickery Dep. at 56.) They had dinner and drinks in a hotel while discussing the possibility of Met–Al supplying Emerson with large quantities of aluminum. Although Vickery asked Davis for his business card at some point during the night, Davis never gave him one, claiming he was not carrying any. (Vickery Dep. at 55.) When the meeting ended, Green offered Vickery a $2,000 "commission" if Met–Al agreed to sell aluminum to Emerson. Vick-

ery turned it down, stating that he was only doing what Met–Al paid him to do.

Vickery took Green's proposal back to Eckert and Lee, who were interested in hearing more. When they contacted Green, he represented that Emerson and GE wanted to purchase large quantities of aluminum from Met–Al for specific divisions. Emerson, Green contended, needed aluminum sent to its Special Products Division in St. Louis, Missouri, while GE desired it for its Motor Plant Processing Center in Fort Wayne, Indiana. Unbeknownst to either Eckert or Lee, Green had no authority from either Emerson or GE to enter into any contracts on their behalf. Both men, however, agreed to provide aluminum to these corporations without any written confirmation from either Emerson or GE. Met–Al never received purchase orders from Emerson prior to shipping aluminum; instead, the transactions were documented by sales confirmation slips. Met–Al, believing the confirmation slips were adequate documentation, never requested purchase orders from Emerson or GE written on the company's letterhead. (Lee Dep. at 81.) Shipments, ostensibly to the corporations, began in December of 1991.

Green coordinated the delivery of the aluminum ingots from Met–Al's facility to other warehouses. (Lee Dep. at 29.) Either he or John Reinke, MBI's traffic manager, would advise Met–Al that Emerson or GE needed a certain type and amount of aluminum and that the aluminum would be picked up on a certain date. Met–Al would then set the requested aluminum aside and complete the necessary documentation. (Groves Dep. at 37, 49.) The aluminum was shipped free on board ("FOB") Met–Al's place of business; thus, Met–Al's responsibility for ensuring safe delivery to the buyer ended at the time the aluminum left its place of business. MBI paid the freight charges and Met–Al believed that the buyers would reimburse MBI upon delivery.

---

2. Eckert and Lee are, respectively, the vice-president and president of Met–Al.

3. Although Met–Al shipped some aluminum to GE, most was intended for Emerson. Thus, the Court shall occasionally refer to both of Green's fictitious customers collectively as "Emerson."

4. Later, Vickery found out that Davis did not work for Emerson and was actually an MBI employee. (Vickery Dep. at 173.)

MBI began contracting with DEI to transport the aluminum from Met–Al's place of business to Hansen Storage, Inc., a warehouse in which DEI leased storage space, in May of 1992. In a typical transaction, John Reinke would notify the DEI drivers about the aluminum waiting at Met–Al's facility. The drivers would proceed to Met–Al's loading dock and announce that they were there for Emerson's aluminum. (Schmit Dep. at 187.) The aluminum would then loaded onto the trucks, and DEI would issue a bill of lading naming Met–Al as the shipper. If Emerson was the purported buyer, the bill of lading would state that the aluminum was being sold to Emerson's Special Products Division at a St. Louis address, and would provide a separate address to which the metal should be shipped. The bills of lading for GE's shipments similarly provided that the aluminum was being sold to GE's Motor Plant Processing Center in Fort Wayne, but should be shipped to another GE plant. Met–Al printed out packing slips to record each shipment, attached them to the bills of lading, and gave them to DEI's truckers. These slips listed Green as a salesman and indicated that the aluminum had been sold to Emerson or GE at one address but should be shipped to another.

After issuing the bills of lading, DEI would transport its cargo to Hansen, where it leased space, and unload it in its cross-docking area. In the shipping industry, it is common for cargo to be stored until the customer is ready for delivery, and Met–Al was aware that the aluminum had been taken to a warehouse. (Eckert Dep. at 260.) Once the cargo was in the warehouse, MBI would order DEI to issue another bill of lading, which changed the name and address of the consignee. (Schmit Dep. at 84.) DEI, as MBI's client, would always comply, even though the new bills of lading were inconsistent with the old ones. Met–Al was neither notified nor consulted about the changes. *Id.* at 93, 94.[5] In this manner, the aluminum

was diverted from the original consignees in St. Louis or Fort Wayne and sold to third parties pursuant to Green's orders.

The defendants believed that MBI owned the aluminum. Reinke informed them that MBI had purchased the aluminum from Met–Al and that it would be shipped to MBI's customers. Green had made it known that Emerson bought all of its metal from MBI. (Schmit Dep. at 99.) DEI and Hansen did not have any reason to doubt these claims, especially since the packing slips attached to the bills of lading had Green named as the salesman. (Schmit Dep. at 99, 109.) Neither Roger Green nor MBI, however, were consignees or consignors on the original bills of lading.

Met–Al sold its aluminum to Emerson and GE on credit. Although customers were supposed to pay for the aluminum within thirty (30) to forty-five (45) days, payment was generally received closer to sixty (60) days after the metal was shipped. (Eckert Dep. at 115, 117.) Because Met–Al made its first shipment of aluminum in December of 1991, it began receiving payments by wire in February of 1992.[6] The payments, which purported to be from Emerson and GE, were shown to be made by MBI. At some time in February of 1992, Met–Al received a wire transfer from a Florida bank drawn on Lynn Green's account. Concerned, it contacted Roger Green, who explained that Emerson was permitting MBI to make some of its distributions on a temporary basis. Met–Al informed him that this was unacceptable, since its contract was with Emerson, not MBI or the Greens. (Eckert Dep. at 114; Lee Dep. at 46.)

As a result, Vickery was sent to St. Louis that same month to meet with Green and Green's brother-in-law, Norman LoPresto[7], whom Green introduced as an officer at Emerson. Vickery explained that Met–Al was unhappy about the wire payments coming

---

**5.** DEI, moreover, never contacted Emerson or GE about whether MBI was authorized to change the consignee on the bills of lading. (Schmit Dep. at 98.)

**6.** This was the only time Met–Al had ever received payment by wire. Previous customers,

including Emerson's Insinkerator division, with which Met–Al had had an earlier contract, had paid by check. (Engberg Dep. at 9.)

**7.** LoPresto was also an officer of MBI.

from Lynn Green's account. (Eckert Dep. at 110.) Green assured him that Emerson had worked out the problems with its payment system and that LoPresto would be accountable for any future problems with the wire transfers. (Eckert Dep. at 118.) When Vickery asked LoPresto for his business card, LoPresto did not provide one, claiming that he kept them in his desk at work. He did, however, provide a telephone number with a St. Louis area code where he could be reached during the day.[8] (Vickery Dep. at 99.)

After the meeting, Green formed two (2) new corporations in the state of Florida—Special Products Division, Inc. and Motor Plant Processing Center, Inc. Next, he caused each to open a bank account in the appropriate city; Special Product Division's account was in St. Louis, and Motor Plant Processing Center's account was in Fort Wayne. On February 27, 1992, Met–Al began receiving wire transfers, previously sent from Florida banks by MBI, from a Special Products Division account in St. Louis, or a Motor Plant Processing Center account in Fort Wayne. The remainder of the payments to Met–Al were made from these accounts. Thus, when Met–Al, still worried about receiving payment from Lynn Green instead of Emerson, asked its banker to trace the wire transfers back to their point of origin, it was relieved to discover that the payments appeared to be coming from the proper accounts in the proper cities, and delved no further into the source of the payments. Met–Al's bookkeeper, however, knew that the transfers were originating from MBI's accounts, as this information was contained in each wire transfer.

When Met–Al sent out its sales confirmations to what it believed were Emerson's and GE's mailing addresses, it would receive replies by FAX from an organization named Special Products Division. Met–Al assumed that the confirmations were from the Special Products Division of Emerson when in reali-

ty, they originated from Green's new corporation.[9] (Eckert Dep. at 89.) The addresses of Emerson's Special Products Division and GE's Motor Products Processing that appeared on the bills of lading as mailing addresses were merely postal drop boxes, from which mail was forwarded to MBI in Florida. (Eckert Dep. at 90.)

As mentioned earlier, MBI did not begin using DEI as its carrier until May of 1992. Although DEI had leased approximately ten percent (10%) of Hansen's storage space for its cross-docking area, it soon became apparent that this was not enough to store the huge amounts of aluminum Met–Al was shipping. When the volume of the aluminum stored exceeded DEI's leased portion of the warehouse, sometime in July of 1992, Hansen and MBI entered into an independent contract whereby MBI agreed to pay Hansen storage fees for any aluminum overflow that DEI could not store. (Schmit Dep. at 54–56.) From the record, it appears that DEI continued to alter the bills of lading with respect to all of Met–Al's aluminum stored in Hansen's facility, not merely that in DEI's cross-docking area. Hansen would only issue a warehouse receipt, however, when it received a truckload of aluminum from DEI for storage outside DEI's leased area.

In the beginning of July of 1992, Gerald Vickery left Met–Al to begin working for MBI. Shortly before Vickery resigned, he decided to accept Green's previous offer of a $2,000 "commission." Green informed Met–Al that although he would still be the person bringing opportunities from Emerson and GE to Met–Al's attention and should be the first person to contact in the event that shipping or sales problems arose, Vickery could be contacted if he was not available. (Eckert Dep. at 375–76.)

The survival of Green's scheme depended upon third parties' payments for the aluminum, so that these payments could be tendered to Met–Al within the sixty (60) day

---

**8.** In addition to having Allen and LoPresto pose as officers of Emerson, Green had a gentleman by the name of Josh Selman pretend to be an officer at GE's Motor Plant Processing Center. Selman was known to be difficult to reach, and most of Met–Al's communications with him were made through his secretary. (Vickery Dep. 115, 119.)

**9.** On one date, LoPresto actually signed sales confirmations for both Emerson and GE.

period of credit. Met–Al claims it discovered that MBI was selling the aluminum to third parties on or about August 1, 1992, and immediately suspended its shipments to "Emerson." (Eckert Dep. at 348.) There is, however, a question as to the amount of time that elapsed between Met–Al's discovery of MBI's fraud and its suspension of aluminum shipments. Frank Vidian, Met–Al's banker, wrote a memo to himself dated 7/10 which memorialized Eckert's concerns over Green's actions and DEI's alteration of the bills of lading. Vidian claims, however, that he is not sure on what date he received Eckert's phone call, remembering only that it was a Friday.[10] He concedes he may have received the call closer to the end of July or even in August.

It is not clear what the market price of aluminum was during the relevant time period. While Met–Al claims that the market price is reflected in its invoices and was increasing in the spring of 1992, there is some evidence that the price of aluminum was actually declining as a result of the poor economy. (Vickery Dep. at 168.)

Met–Al, unable to meet its creditors' obligations, filed for bankruptcy in August of 1992 and is currently reorganizing under Chapter 11 of the Bankruptcy Code. MBI was forced into involuntary bankruptcy by its creditors, and a federal indictment has been issued against Roger and Lynn Green.

## II. LEGAL FRAMEWORK

### A. SUMMARY JUDGMENT

Rule 56, Fed.R.Civ.P., provides, in part, that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When the facts are disputed, the parties must produce proper documentary evidence to support their contentions, and may not rest on mere allegations in the pleadings, or upon conclusory statements in affidavits." *Howland v. Kilquist,*

833 F.2d 639, 642 (7th Cir.1987) (citations omitted).

■ The initial burden is on the moving party to show that there are no material facts in dispute and that he or she is entitled to judgment as a matter of law. The burden then shifts to the non-moving party, which must "go beyond the pleadings" with specific facts supporting each element of its cause of action, thus showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Even so, the existence of a factual dispute will preclude the court from entering summary judgment only if that dispute is outcome-determinative. *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir. 1983) (en banc). Throughout, the court must draw all reasonable inferences in favor of the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### B. BILLS OF LADING

■ A bill of lading is an instrument by which goods may be transferred from seller to buyer when a direct transfer is impossible and the goods must be shipped by a carrier. It describes the goods shipped, sets forth the identity of the shipper (or consignor) and the buyer (or consignee), and directs the carrier to deliver the freight to a certain location or person. A negotiable bill of lading calls for the freight to be delivered to the bearer of the bill; one who has possession of a negotiable bill of lading is deemed to have title to the shipped goods. A nonnegotiable bill of lading, in which a consignee is specified, may be considered evidence of title, but the transfer of a nonnegotiable bill of lading does not, in and of itself, transfer title to the goods under the bill. White & Summers, *Uniform Commercial Code,* § 21–4 at 163 (1988).

■ Bills of lading are thus contracts between shippers and carriers that spell out the carrier's obligation to deliver specific goods to specific people or places. *Interocean S.S. Corp. v. New Orleans Cold Storage & Warehouse Co.,* 865 F.2d 699, 703 (5th Cir.1989).

---

**10.** July 10, 1992 was a Friday, as was July 31, 1992, the date of the last shipment.

As contracts of adhesion, they are strictly construed against the carrier. *Allied Chemical International Corp. v. Companhia de Navegacao Lloyd Brasileiro,* 775 F.2d 476, 482 (2d Cir.1985).

The Federal Bill of Lading Act ("FBLA"), 49 U.S.C.App. § 81, *et seq.,* governs bills of lading for goods in interstate commerce. Under the FBLA, a carrier must deliver goods shipped under a bill of lading to:

(a) A person lawfully entitled to the possession of the goods, or

(b) The consignee named in a straight bill [11] for the goods, or

(c) A person in possession of an order [12] bill for the goods, by the terms of which the goods are deliverable to his order; or which has been indorsed to him, or in blank by the consignee, or by the mediate or immediate indorsee of the consignee.

49 U.S.C.App. § 89. If a carrier operating under the FBLA disregards the bill of lading and delivers goods to a person not entitled to their possession, it will be liable to anyone with a property right in the goods. 49 U.S.C.App. § 90.

Wisconsin law differs slightly, providing that a carrier may deliver goods to one whose name does not appear on a nonnegotiable bill when he has received instructions from:

(a) The consignor, notwithstanding contrary instructions from the consignee; or

(b) The consignee, in the absence of contrary instructions from the consignor, if the goods have arrived at the billed destination or if the consignee is in possession of the bill; or

(c) The consignee, if the consignee is entitled as against the consignor to dispose of the goods.

Wis.Stat. § 407.303.

## III. DISCUSSION

### A. MET–AL'S CLAIMS AGAINST DEI

Met–Al now seeks damages for the loss of 157 truckloads of aluminum worth $4.1 million. Met–Al argues that, in altering the original bills of lading, DEI converted Met–Al's aluminum, breached its bailment, and acted negligently, thereby violating its duties as a carrier under the FBLA. DEI's failure to strictly comply with the terms of the bills of lading, Met–Al asserts, makes DEI liable for each misdirected shipment.

DEI's response focuses on Met–Al's intent to pass title to the aluminum to the consignee when shipped from its place of business. Met–Al, DEI points out, sold the aluminum on credit and shipped it FOB from its place of business. Thus, even though Met–Al did not immediately receive fair value, it evinced its intent to relinquish control of the metal. As such, DEI contends, title passed from Met–Al as the aluminum left its facility.

DEI further claims that title, albeit voidable as the sale was induced by fraud, passed to MBI. Once title had passed, Met–Al lost the right to maintain an action for conversion, for which, among other things, the wronged party must have had the right to immediate possession of the converted goods. Since the passage of title and Met–Al's surrender of control over the aluminum indicate that Met–Al no longer had a right to possess the aluminum, DEI asserts, Met–Al cannot maintain an action under the FBLA.

In support of its transfer-of-title theory, DEI argues that Met–Al could not have been selling its aluminum to Emerson or GE, as neither "buyer" knew of or consented to a sale. Instead, Met–Al sold to "impostors," MBI or corporations under its control, believing that Green had arranged sales with Emerson and GE. Thus, the sales that transpired went as planned and title was transferred, even though Met–Al had been duped into believing that title was transferred to Emerson or GE, not MBI.

DEI further contends that MBI, not Met–Al, was the shipper for the purposes of the bills of lading. The fact Met–Al was on the

---

**11.** A "straight bill" is one "in which it is stated that the goods are consigned or destined to a specified person." 49 U.S.C.App. § 82. The bills in this case appear to be straight bills of lading.

**12.** An "order bill" is negotiable. 49 U.S.C.App. § 83.

bills as shipper, DEI argues, is not conclusive evidence that Met–Al was the shipper, but instead one factor to be assessed in that determination. MBI arranged for DEI to ship the metal and Met–Al sold it, on credit and FOB its place of business. DEI asserts that, because the consignee, or buyer, has the right to direct shipment when the goods are sold FOB the seller's place of business, and MBI was both the buyer and the shipper, MBI was entitled to direct DEI to change the bills of lading.

Finally, DEI asserts, summary judgment should be entered against Met–Al because Met–Al's own negligence caused its loss. Met–Al, DEI claims, cloaked MBI with indicia of ownership. The packing slips attached to the bills of lading, for instance, did not name GE or Emerson as the owners of the aluminum. The fact that payment for the aluminum was made by wire should have raised Met–Al's suspicions, moreover, as no customer had previously paid by wire. There was also considerable evidence that MBI, not Emerson or GE, was actually directing the wire payments to Met–Al's account. Meetings with "representatives" of GE and Emerson, for instance, were staged in public places, not office buildings, and LoPresto signed sales confirmations for both Special Products Division (Emerson) and Motor Plant Processing (GE). Describing Vickery's commission as a "bribe," DEI further claims that Vickery's knowledge of MBI's fraud should be imputed to Met–Al. Finally, DEI asserts that as of July 10, 1992, based on Vidian's memo, Met–Al had direct knowledge that the aluminum was not being shipped pursuant to the bills of lading. Met–Al failed to take any action, however, until July 31, 1992. According to DEI, Met–Al thus ratified MBI's scheme and is estopped from recovering against DEI.

## B. MET–AL'S CLAIMS AGAINST HANSEN

Met–Al's claims against Hansen are similar to those discussed above, except that they arise under state law. They rely on the fact that DEI and Hansen are owned by the same family and share employees. Peter Schmit, who altered the bills of lading, was Hansen's secretary/treasurer as well as DEI's general manager. (Schmit Dep. at 8.) Because Schmit should have known that DEI had no authority to deliver aluminum other than to Emerson or GE, Met–Al contends, Hansen, as well as DEI, is liable to Met–Al under state law. In addition, some of the aluminum was stored in portions of Hansen's warehouse that were not rented by DEI. As such, argues Met–Al, Hansen, not DEI, had control over releasing and retaining the metal.

Met–Al alleges that Hansen converted its aluminum when it released the metal to other carriers in contravention of the original bills of lading. As indicated earlier, one of the elements of a cause for conversion is that the plaintiff must prove that it was entitled to immediate possession of the converted chattel. Met–Al now claims that, as consignor on the bills of lading, it retained the authority to divert the aluminum and, in fact, could have ordered Hansen to return the metal to its place of business; thus, it was entitled to immediate possession. Met–Al contends that, because Hansen was obliged to deliver the aluminum to the person entitled to possession under the bill of lading, but delivered it to neither Met–Al nor the consignees, it is liable for the misdirected aluminum over which it had control.

Hansen disputes that Met–Al was entitled to immediate possession of the aluminum at the time of the alleged conversion. Hansen argues that the language of Section 407.303, Wis.Stat., upon which Met–Al relies to support its claim of a possessory interest, is permissive, stating that a carrier *may* deliver goods to someone whose name does not appear on a bill of lading pursuant to a consignor's instructions. As the carrier is thus under no obligation to do so, however, the nebulous control that Met–Al, as a consignor, exercised over the aluminum is insufficient to bestow on Met–Al any property interest. Met–Al, Hansen argues, had neither title to the aluminum nor a special, insurable, or security interest therein. In addition, Met–Al neither bore nor assumed the risk of loss of the aluminum.

Hansen then argues that the provisions of Section 407.303, Wis.Stat., give the consignor rights as against a carrier, not a warehouse-

man. To begin, the bills of lading were contracts between Met–Al and DEI to which Hansen was not a party. Thus without privity, Hansen had no concomitant duty. Even assuming it owed a duty under the bills of lading, Hansen argues, the duty was fulfilled when delivery was made to the owners of the aluminum under the amended bills of lading. Hansen complied, in good faith, with instructions from its customers, Green and MBI, unaware that Met–Al had any interest in the aluminum. Furthermore, asserts Hansen, Met–Al cloaked MBI with indicia of ownership, thus permitting MBI to exert control over the aluminum. As such, Met–Al is estopped from seeking damages for MBI's conduct.

That any of the 157 shipments of aluminum at issue were ever in their custody, Hansen further claims, there is no proof. Although uncontroverted that DEI needed additional storage space for Met–Al's aluminum and Hansen agreed to provide it, it remains unclear which shipments were stored in DEI's section of the warehouse. In addition, because MBI was cross-docking its aluminum as a customer of DEI, it was not until July of 1992, when the scheme was unraveling, that MBI and Hansen contracted for warehouse space. Finally, asserts Hansen, there is an issue of fact as to the actual damages arising from the fluctuating price of aluminum. Hansen contends that the prices Met–Al charged were increasing in the first part of 1992, while the national price index for the same period indicates aluminum prices were decreasing.

## IV. ANALYSIS

Although this matter is fraught with complexity, the Court finds that no material issues of fact preclude entry of judgment for one party or another with respect to liability. Whether the defendants should be held liable for Met–Al's losses depends upon whether Met–Al retained a possessory interest in the aluminum once shipped, and whether MBI obtained title, and of what kind, to the aluminum. Quite simply, if Met–Al had a right to immediate possession, or some analogous interest, and MBI had no right to possession,

Met–Al is entitled to damages under the FBLA and Section 407.403, Wis.Stat.

### A. MBI HAD NO LAWFUL TITLE

The Uniform Commercial Code makes a substantial distinction between one who unlawfully converts goods by theft and one who unlawfully converts goods by deceit. The first is a mere thief, condemned to hold no title (or void title) to the goods and unable to convey good title, even to a good faith purchaser for value. The deceiver, on the other hand, is the holder of voidable title and has good title against anyone other than the original owner of the goods. The holder of voidable title, moreover, may transfer good title as against the original owner to a good faith purchaser for value. U.C.C. § 2–403.

"Voidable title," undefined by the Code, passes when the underlying contract between the seller and the defrauder is subject to avoidance at common law. Anderson, 3 *Uniform Commercial Code, Text, Cases, Commentary* § 2–403:20 (1983). Section 2–403 codifies four (4) such circumstances: "(a) the transferor was deceived as to the identity of the purchaser, or (b) the delivery was in exchange for a check which is later dishonored, or (c) it was agreed that the transaction was to be a 'cash sale,' or (d) the delivery was procured through fraud punishable as larcenous under the criminal law." U.C.C. § 2–403(1).

To argue that MBI and Met–Al intended to enter into a contract, and that good title as against the world passed when DEI's carriers took the aluminum from Met–Al's place of business, simply defies the record. MBI thus had voidable title to the aluminum, if any. DEI contends that MBI *did* have voidable title, and thus was entitled to possession of the aluminum and empowered to alter the bills of lading without Met–Al's consent.

In large part, the theory of voidable title was developed to protect good faith purchasers for value from swindlers in the event the original owner returns to demand its property.[13] Though Section 2–403 does

---

**13.** In support of its contention that MBI had

voidable title, and hence good title as against

not bestow upon the holder of voidable title any superior right to control the goods than that held by others entitled to lawful possession,[14] voidable title can pass as good title even though fraudulently incurred. *See, e.g., Chicago, M., St.P. & P.R. Co. v. Flanders,* 56 F.2d 114, 117 (8th Cir.1932). As such, if MBI held voidable title to the aluminum, it was entitled to immediate possession and had authority to divert the aluminum, regardless of the bills of lading. Under the FBLA, the diverting party need not be named on the bill if the carrier is aware of the diverting party's property interest in the goods. 49 U.S.C.App. § 89(a). In this case, DEI was apparently told that MBI owned the aluminum. If this had been true, MBI would have been justified in issuing new bills of lading.

 Because swindlers who fraudulently claim to be acting on behalf of an unwitting third party cannot obtain even voidable title, however, MBI had no lawful interest in the aluminum, and thus, no authority to modify the bills of lading.

Both defendants have relied almost exclusively on *Flanders,* 56 F.2d 114, in support of their position that MBI was lawfully entitled to divert the aluminum. In *Flanders,* an imposter holding himself out as Will Buntrock, a prosperous citizen of South Dakota, arranged for the plaintiff to ship him cattle on credit. The plaintiff found Buntrock credit-worthy and loaded the cattle on the defendant carrier for transport from Sioux City, Iowa. The imposter intercepted the carrier in transit, produced copies of his documents of purchase,[15] and convinced the station operator to reroute the cattle back to Colton, South Dakota, whereupon he sold the cattle to third parties and never paid the plaintiff. The plaintiff, contending that the carrier had failed to deliver the shipment to the consignee in the bill of lading, the real Will Buntrock, argued that the carrier was liable for diverting the cattle. The defendant responded that, because the imposter had appeared to be the title owner of the cattle, it had been obliged to divert the cattle according to his directions.

The district court granted a directed verdict for the plaintiff. The Eighth Circuit Court of Appeals reversed, holding that the common carrier was not liable for diverting the cattle because the imposter had voidable title. "Though deceived as to the buyer's identity and responsibility, yet the plaintiff sold to this imposter, and title passed to him." *Id.* at 117. The court, noting that the plaintiff "clothed [the imposter] with documentary insignia of ownership" by taking his chattel mortgage and giving him the purchaser copy of the sales account and a shipping order, rejected the argument that the imposter had "stolen" the cattle, and found instead that the plaintiff had intended to sell to the person with whom he had bargained and was merely deceived as to the purchaser's identity. *Id.*

In *Flanders,* the vendor entered into a contract of sale with a person claiming to be someone else. MBI, on the other hand, purported to direct Met–Al's aluminum to legitimate, well-known corporations, and Met–Al shipped its aluminum upon the assumption that it would be received by someone other than MBI. In such cases, where the defrauder pretends to act as an agent for a named third party, most courts have held that no title, even voidable, will pass.

Met–Al, DEI cites *Club Pro Golf Products, Inc. v. Simpson,* 7 U.C.C.Rep.Serv.2d 425, 1988 WL 391512 (Va.Cir.Ct.1988). In *Simpson,* a dishonest salesman placed fictitious orders with the plaintiff, and diverted the goods once they were shipped. The salesman then sold the goods to Simpson, the good faith purchaser, and kept the proceeds. Holding that the salesman had voidable title and could therefore transfer good title to a good faith purchaser, the Court dismissed the plaintiff's action against Simpson.

**14.** Thus, even assuming that MBI had voidable title in the aluminum, such title was not superior to the possessory interest concurrently held by

Met–Al, as Met–Al had the right to reassert its interest upon discovery of MBI's fraud. *Hudiburg Chevrolet, Inc. v. Ponce,* 17 Wis.2d 281, 116 N.W.2d 252, 256 n. 8 (1962).

**15.** The case does not specify whether the bill of lading was negotiable or non-negotiable. One of the factors upon which the Eighth Circuit relied, however, is that the imposter had a copy of the bill of lading at the time he diverted the shipment, and that the carrier was authorized under the FBLA to deliver the cattle pursuant to his instructions. *Flanders, supra,* 56 F.2d at 117.

Ironically, *Flanders* cites *Phelps v. McQuade,* 220 N.Y. 232, 115 N.E. 441 (1917), in which the court discussed various factual scenarios with respect to the passage of title. According to *Phelps,* the crucial question is whether "the vendor of personal property intends to sell his goods to the person with whom he deals." If so, title passes. If not, the defrauder obtains no title. *Id.* at 442. Of particular relevance here, the *Phelps* court analyzes the class of cases where: "persons falsely stating that they are the agents or representatives of others [have, through this deception,] fraudulently obtained possession of goods under a pretense of sale to such others. There is no intention on the part of the vendor to sell to the pretended agent or representative *and no title passes." Id.* at 442 (emphasis added).

More than a century ago, the Wisconsin Supreme Court addressed the same issue in an action for the replevin of nearly two (2) tons of cheese. *Mayhew v. Mather,* 82 Wis. 355, 52 N.W. 436 (1892). In that case, Mayhew contracted to sell cheese to William E. Smith & Co. through Smith's agent, Mather. After several months of shipping cheese addressed to Smith, Mayhew discovered that Mather was attempting to sell the cheese to other parties and sought to rescind the contract and regain possession of the cheese. The court found that because Mather had purchased the cheese while falsely claiming to be Smith's agent, no title had passed. *Id.* at 362, 52 N.W. 436. Even a good faith purchaser, the Court found, could not have obtained good title from a seller like Mather, and thus would have been at risk in any action by the original owner. *Id.*

*Mayhew,* though older even than this venerable courthouse, remains good law in Wisconsin. Moreover, as far as the Court is aware, of the other states to have addressed this issue only Tennessee has held that voidable title is passed to an agent when the seller intends to contract with the principal. *Hawkins v. Davis,* 67 Tenn. 506 (1875); *see also* Weber, *The Extension of the Voidable Title Principle Under the Code,* 49 Ky. L.J. 437, 445 n. 23 (1961). The principle set forth in *Mayhew,* moreover, is consistent with *Flanders,* where the court relied heavily upon documentary evidence supporting the original owner's intent to transfer ownership. Here, on the contrary, the undisputed evidence shows that Met–Al intended to sell aluminum not to MBI but to Emerson or GE. Under the foregoing authority, therefore, MBI obtained no title, voidable or otherwise.

To this, defendants argue that Met–Al *did* intend to sell its aluminum to MBI, albeit as an imposter for Emerson; MBI simply fooled Met–Al into believing that it was Emerson by having its employees pose as Emerson employees. While interesting, this argument is not persuasive. Met–Al never believed, for instance, that Roger Green or MBI were Emerson. Moreover, while Met–Al may have been deceived as to the true identity of those who posed as Emerson employees, MBI and Emerson remained distinct entities, and Met–Al never intended that MBI purchase the aluminum.

In *Flanders,* the railroad operator was presented with the imposter's legitimate documents of sale, given him by the plaintiff during their face-to-face transaction. DEI argues that it was presented with analogous indicia of ownership provided to MBI by Met–Al, namely control of shipment—and that Met–Al thus "cloaked" MBI with indicia of ownership. A review of the record, however, provides scant support for this contention. In fact, there exists more evidence to the contrary. Even assuming, as DEI claims, that MBI was an imposter of Emerson, DEI could not justify its acquiescence to the aluminum's diversion because the original bills of lading contain no reference to Roger Green or MBI. Green was named as a salesman on the attached packing slip, but DEI makes no argument that this document had any legal significance, much less vested title in MBI. The Court finds, moreover, that a reasonable carrier would not rely on a mere packing slip to defeat its legal obligations to the named consignor on the original bill of lading.

The case law contemplates swindlers claiming agency for a respectable buyer or established corporation. MBI, however, purported to be a broker, working for commission, with more limited duties than an agent. In any event, the claim that MBI and Green

were not Emerson's purported agents is a red herring. The real dispute here is whether title passed, and the crucial issue is whether Met–Al intended to convey goods to a certain party. As between swindlers and their purported principals elsewhere, Green's relationship with Emerson was purely fictitious. Accordingly, though all the cases arose in the agency context, their guiding principle is no less applicable here. Thereunder, the Court concludes, MBI had no title, voidable or otherwise, in the aluminum.

## B. Met–Al's Right to Immediate Possession

■ The next question presented is whether Met–Al had title to the aluminum once on DEI's trucks. Under the relevant statute, when the goods are shipped FOB the seller's place of business, title is usually transferred "at the time and place at which the seller completes his performance with reference to the physical delivery of the goods," unless there is a contrary contractual provision. Wis Stat. § 402.401(2)(a). It would thus seem that once DEI picked up the aluminum at Met–Al's facility, Met–Al was no longer contractually obliged and title passed. This result accords with the case law, which holds that title passes with the intent of the parties. See, e.g., Tri–County Finance, Inc. v. Miller, 267 Wis. 174, 65 N.W.2d 39, 41–42 (1954). Met–Al agreed to ship the aluminum FOB its place of business, shifting the risk of loss thereafter to the buyer. This evinces Met–Al's intent to pass title to Emerson or GE then. See Ninth Street East, Ltd. v. Harrison, 5 Conn.Cir. 597, 259 A.2d 772 (1968) (title to goods passes at FOB point).

The question then becomes to whom—if not to Emerson or GE because they were not parties to the fraudulent contracts—title passed. DEI had responsibility for the aluminum, while under its control, as Met–Al's bailee, but this obligation fell short of ownership. As discussed above, moreover, no title, voidable or otherwise, passed to MBI or Roger Green.

Courts following *Mayhew* have held that, when a vendor believes he is selling to a corporation through its agent and is thereafter defrauded by that agent, title never passes. As such, the vendor maintains good title throughout the transaction.[16] This principle holds true even as against a good faith purchaser. Finding that Met–Al retained title in the aluminum not only comports with state law, moreover, but commends itself to reason. Here, for instance, some party must have held title in the aluminum while it was being shipped; by a process of elimination, Met–Al is the best choice.

That Met–Al intended to convey away its title, as DEI argues, is not persuasive in light of the deference Wisconsin courts give to a seller's intent at the time of the transaction. If Emerson had truly been acting through Green, then title would have passed, since it was Met–Al's intent to sell to Emerson. The fact that Green only pretended to such agency in order to obtain the aluminum, however, nullifies whatever intent to pass title Met–Al possessed, since Met–Al clearly did not intend to pass title to MBI. Without the requisite intent to pass title, Met–Al retained sufficient possessory interest in the aluminum while under the defendants' control to maintain an action under the FBLA.

## C. DEI's Liability to Met–Al

■ The defendants, though arguing about impostors, voidable title, and indicia of ownership, fail to address why the bills of lading were altered when MBI, at least from the face of the bills, had no interest in the aluminum. A bill of lading is construed strictly, and may be amended by the carrier only on the instructions of either the consignee or a person lawfully entitled to immediate possession of the goods. In this case, MBI was neither, yet DEI issued new bills of lading without investigating MBI's interest with either Met–Al, Emerson or GE.

DEI now attempts to elude liability by claiming that Met–Al was either no longer in control of the aluminum, or that MBI had

---

**16.** As the Wisconsin Supreme Court wrote simply and unequivocally, "No title passed." *May-hew, supra,* 82 Wis. at 362, 52 N.W. 436.

title thereto and was thus entitled to immediate possession. In light of the FBLA, however, the Court rejects DEI's explanations. As such, the Court finds DEI liable to Met–Al for amending the bills of lading at MBI's direction and thus enabling MBI to divert the freight to its warehouses in Florida. Under the bills of lading, contracts between Met–Al and DEI for the delivery of the aluminum to the consignees designated on the bills, the aluminum was to be delivered to Emerson's Special Products Division in St. Louis. DEI had a statutory obligation to comply with the bills as written, and would have been authorized to ship to another only if lawfully entitled to possession. As MBI was not so entitled, DEI is liable to Met–Al for the value of the misdelivered aluminum.

DEI notes that "[w]here one of two innocent parties must sustain a loss from the fraud of a third, such loss must fall upon the one, if either, whose act has enabled such fraud to be committed." *Swift v. Davis*, 118 Misc. 205, 193 N.Y.S. 848, 852 (1922). Several occurrences, DEI argues, show that Met–Al was so anxious to sell aluminum to Emerson and GE that it failed to employ any business acumen. First, the payment to Vickery should have been construed as a bribe for his assistance in the scheme, and Vickery's knowledge of MBI's fraud should thus be imputed to Met–Al. Next, Met–Al should have regarded LoPresto suspiciously after receiving a wire transfer early in 1992 which named LoPresto as an associate of MBI, not Emerson, and especially when he later reappeared at the end of July of 1992, signing sales confirmations from both Emerson and GE on the same day. Finally, Lisa Brehm, Met–Al's bookkeeper, testified that she knew all along that the wire transfers were coming from MBI, not Emerson and GE.

 Even if true, however, these facts should not deprive Met–Al of relief. To begin, equitable defenses to allegations of misdelivery are disfavored. "From the fact that the Code makes express provisions with respect to estoppel in §§ 2–403, 9–307 and 9–309, it is to be deduced that the principle of estoppel does not apply to nonnegotiable documents of title." Anderson, 7 *Uniform Com-*

*mercial Code*, § 7–104:5 at 460 (1985). More importantly, however, Met–Al's gaffes are not so egregious as to counsel setting aside the clear mandate of the FBLA. LoPresto's signature on sales confirmations for both Emerson and GE, for instance, could have been overlooked easily, especially if received by different persons. Moreover, although Brehm's knowledge might have been imputable to Met–Al, it would not have been unreasonable for Met–Al to assume that it was being paid properly. The wires were, after all, originating from the right cities and what appeared to be the right parties. Met–Al may even have assumed that MBI had assisted Emerson and GE in setting up the accounts for the purpose of expediting payment. Furthermore, if Vickery was actually engaged in a fraudulent conspiracy against Met–Al, his knowledge was not imputable to the corporation. W. Fletcher, 3 *Cyclopedia Corporations* § 826 (1986). Finally, even if the date on Vidian's memo is correct, meaning that Met–Al discovered Green's fraud on July 10 but did not cease delivery until July 31, it should not be estopped from statutory relief.

Met–Al was, at the very least, careless in entering into a multimillion dollar agreement without written confirmation from the purported buyer. Had they exercised more caution in attempting to confirm MBI's representations, the scheme might have come to light earlier. Nevertheless, had DEI delivered according to the bills of lading instead of allowing MBI to change the consignee and the destination, Met–Al would almost certainly not be in bankruptcy. DEI's willing participation, in violation of the FBLA, made it possible for the Greens to perpetrate their fraud against Met–Al. In finding an analogous carrier liable for the misdelivery of diamonds, the Supreme Court of Ohio wrote:

> The duty which the law imposed upon the carrier was to transport the goods to Hopkinsville, and deliver them to the consignee named, unless prevented by the act of God or the public enemy ... This high obligation is imposed upon the carrier from considerations arising out of the fact that he has unqualified dominion of the goods for the purpose of carriage and delivery,

and from the general course of business among consignors and consignees. The cases are numerous in which the carrier's liability has been held to be upon contract, and that delivery to the wrong person is a conversion unless such wrong delivery is induced by the consignor ... [T]he schemes by which Rothschild [the swindler] persuaded the carrier's agent that he was the consignee should not divert attention from the manifest breach of its undertaking ... Rothschild did not gain possession of the diamonds by the misrepresentation which induced the plaintiffs to consign them to Jones. The misrepresentation effective for that purpose was made to the carrier when he persuaded its agent that he was the consignee.

*Oskamp v. Southern Exp. Co.*, 61 Ohio St. 341, 56 N.E. 13, 14 (1899). It is true that MBI fooled both Met–Al and DEI. The latter, however, had an unequivocal statutory duty to Met–Al. By violating that duty, DEI enabled MBI to convert millions of dollars of aluminum, and must therefore be held liable for Met–Al's damages.

### D. HANSEN'S LIABILITY

Hansen's liability is not so clear. Although it is undisputed that Met–Al's aluminum was stored in Hansen's warehouse, either by DEI or by MBI directly, the nexus between Met–Al and Hansen is nebulous. Peter Schmit, who worked for both Hansen and DEI, admits that he occasionally contacted Met–Al as a representative of Hansen. The responsibility for the bills of lading and delivery of aluminum, however, rested solely upon DEI. Hansen merely served as a way station for the aluminum in transit from Met–Al's facility to its final destination.

■ Met–Al argues that Hansen is liable for "conversion," breach of bailment, and negligence. Conversion is "the wrongful or unauthorized exercise of dominion or control over a chattel," *Farm Credit Bank. v. F & A Dairy*, 165 Wis.2d 360, 477 N.W.2d 357, 361 (App.1991), and results from a wrongful taking or a wrongful refusal to surrender property originally lawfully obtained. *Schara v. Thiede*, 58 Wis.2d 489, 206 N.W.2d 129, 133 (1973). If the conversion defendant has not

wrongfully taken possession of the plaintiff's chattel, however, "a demand by the rightful owner and a refusal by the alleged tortfeasor are necessary elements of the tort." *Production Credit Assoc. v. Nowatzski*, 90 Wis.2d 344, 280 N.W.2d 118, 123 (1979).

■ Hansen is not liable to Met–Al for conversion. Met–Al has presented no evidence that Hansen controlled the aluminum stored in DEI's cross-docking area. Moreover, though Hansen may have exercised control over the aluminum stored in DEI's portion of the warehouse, such control was not wrongful. That aluminum came directly from MBI, independent of the original and altered bills of lading, and Hansen simply stored it and issued a warehouse receipt to MBI. Absent any wrongful taking by Hansen, Met–Al could maintain an action for conversion only if it had demanded the aluminum from Hansen and been refused. Met–Al, however, makes no such claim, and the Court finds no basis in the record from which to infer it.

■ The Wisconsin statute imposing duties on a warehouseman describes him as a bailee, Wis.Stat. § 407.403(1), which would seemingly subject a warehouseman to liability for wrongful delivery. Hansen cannot, however, be described properly as Met–Al's bailee. If, in fact, Hansen was bailee to anyone, it was to DEI. Met–Al entrusted not Hansen but DEI with the aluminum, thus making DEI its bailee. DEI simply stored the aluminum in Hansen's warehouse.

Met–Al seemingly advocates a statutory construction that would superimpose the duties of a carrier onto a warehouseman through § 407.403(1)–(e), Wis.Stat., which implicates § 407.303, Wis.Stat. Such a construction, however, is too problematic. It would require, for instance, that a warehouseman be held liable for a fraudulent carrier's misdeeds, even where the warehouseman owed a negligible duty to the shipper, and would undermine any agreement between the carrier and the warehouseman, the parties actually in privity as to the storage contract. The warehouseman would be subject to the orders of both shipper and carrier, and the shipper could look to two (2)

bailees to recover misdelivered goods, despite having entrusted them to one.

■ Finally, Met–Al argues a corporate "alter-ego" theory, wherein DEI's knowledge of the changed bills of lading is imputed to Hansen through Peter Schmit, the secretary/treasurer of Hansen and the general manager and secretary/treasurer of DEI. It is undisputed that Schmit, in his capacity at DEI, was aware of DEI's alteration of the bills of lading and failure to verify their accuracy with either Met–Al or the consignees. As such, Met–Al claims, this knowledge is imputed to Hansen, making negligent Hansen's release of the goods in compliance with MBI's directives. In support, Met–Al cites *Ivers & Pond Piano Co. v. Peckham,* 29 Wis.2d 364, 139 N.W.2d 57 (1966), in which the Supreme Court of Wisconsin held that an agent's knowledge is imputed to his or her principal. The court did not address, however, whether an agent's knowledge is imputable to any other principal to whom the agent owes a similar duty.

■ Several rules govern knowledge imputed from one corporation to another through a common officer. When two (2) parties engaged in a transaction share a common agent, for instance, the agent's knowledge is imputed to both parties. In contrast, "where the same person happens to be an agent of two principals not thus interested, notice to him will not necessarily be notice to both principals. To make it so there must be some duty imposed upon him to communicate it to the principal sought to be affected." W. Fletcher, 3 *Cyclopedia Corporations* § 824 at 136 (1986). It has been similarly established that, "where one is an officer of two corporations which have business transactions with each other, his knowledge cannot be attributed to either corporation in a matter in which he did not represent it." *Id.* at 136. In any matter in which the officer represented both corporations, however, his knowledge is attributed to both. *Id.*

■ Schmit knew that DEI was altering Met–Al's bills of lading, and the Court has found that DEI was negligent, at the very least, in altering the bills of lading in reliance on MBI's assurances that it owned the aluminum. Regardless of whether Schmit believed that MBI owned the aluminum or that DEI was negligent, however, it was unreasonable to direct—that is, under similar circumstances no reasonable carrier would have directed—a carload of aluminum to a party unnamed by any documents of title. The record indicates, moreover, that Schmit was directly involved in leasing Hansen's space to MBI. On July 31, 1992, he wrote a letter to Roger Green, on Hansen letterhead, about the agreement to lease space that MBI had recently made with Hansen. Because Schmit acted as the agent for both DEI and Hansen in his transactions with MBI, the Court imputes his knowledge of the altered bills of lading to Hansen. Furthermore, because any reasonable warehouseman should have known that DEI had no authority to alter the bills of lading pursuant to MBI's instructions, Schmit's knowledge of DEI's negligence is also imputed to Hansen.

Even though Hansen knew of DEI's alteration of the bills of lading, however, the Court holds that Hansen is not liable for Met–Al's losses. Met–Al, the Court finds, has failed to sufficiently allege against Hansen a cause of action for negligence, one of the prerequisites for which is a duty owed by the defendant. *Nelson v. Davidson,* 155 Wis.2d 674, 456 N.W.2d 343, 345 (1990). As discussed above, Hansen was neither Met–Al's bailee nor controller of the aluminum (and thus could not be held liable for converting Met–Al's property). In these circumstances, in fact, the Court can find no relationship between Met–Al and Hansen which would create such a duty. While there is an implied contract between every consignor and carrier on a bill of lading, for example, there was no such privity between Hansen and Met–Al. Most of the aluminum stored by Hansen was not, moreover, under its control—it was in DEI's cross-docking area. The aluminum that was stored directly by Hansen was stored pursuant to an agreement between Hansen and MBI. To hold that Hansen owed a duty to Met–Al simply because it knew about DEI's conduct would unjustifiably extend the law. A duty, the Court notes, can arise only from a special relationship between parties. Here, the par-

ty sharing such a relationship with Met–Al was DEI, which was statutorily obligated to honor the bills of lading. Hansen, on the other hand, owed no duty to Met–Al, statutory or otherwise, and thus cannot be held liable for negligence.

■ The Fifth Circuit has held that a warehouseman not party to a bill of lading cannot be liable for misdelivery of the goods thereunder, but only for its failure to act in good faith or in a commercially reasonable manner. *Interocean S.S. Corp. v. New Orleans Cold Storage & Warehouse Co.,* 865 F.2d 699, 703 (5th Cir.1989). The logic of *Interocean* is inescapable. The carrier's duty to the shipper arises under the bill of lading, a contract. The warehouse, not party thereto, merely undertakes to perform a portion of the contract for the carrier by storing the goods during delivery. So doing, the warehouse acts as an agent of the carrier, which is responsible for its acts. *Id.* at 703. There is, however, no duty owed by the warehouse to the shipper.

Hansen was not involved in the relevant transactions to the extent contemplated by Wisconsin and common law. As it was not Met–Al's bailee, Hansen owed Met–Al no bailee's duty. As no demand for the goods was made, Hansen converted none of Met–Al's aluminum. Finally, though Hansen should have known that DEI was improperly altering the bills of lading, it owed no duty to Met–Al that can serve as the basis for actionable negligence. As such, the Court must grant Hansen's motion for summary judgment.

### E. DAMAGES

Met–Al and DEI disagree on the amount of damages to be awarded to Met–Al, and the parties have had no opportunity to substantially address the law under which they will be imposed. Issues of fact as to damages remain, moreover, including whether to employ the market price of aluminum, and whether Met–Al is entitled to the entire amount set forth in its invoices. Additionally, if the market price of aluminum is the appropriate measure of damages, the Court must quantify that price. As it stands, there exists insufficient evidence in the pleadings

with which to resolve these issues. Met–Al's motion for summary judgment must therefore be denied as to the issue of damages.

## V. CONCLUSION

Distribution Express, Inc. violated the Federal Bill of Lading Act when it altered bills of lading without notifying any lawful holder of title, and is liable to Met–Al, Inc. for the value of the aluminum it shipped to Metal Brokers International, Inc.'s designated consignees, in an exact amount to be determined at a later hearing. Hansen Storage Co., however, is not liable to Met–Al, Inc. under theories of breach of bailment, conversion, or negligence.

**IT IS THEREFORE ORDERED** that plaintiff's motion for partial summary judgment be **GRANTED** as against defendant DEI and **DENIED** as against defendant Hansen.

**IT IS FURTHER ORDERED** that defendant DEI's motion for summary judgment be **DENIED.**

**IT IS FURTHER ORDERED** that defendant Hansen's motion for summary judgment be **GRANTED.**

A status conference will be conducted on *Thursday, August 12, 1993 at 9:00 a.m.* in Courtroom 390 of the Federal Building, 517 East Wisconsin Avenue, Milwaukee, Wisconsin, at which time the Court will set a briefing schedule for motions on damages. Counsel for Met–Al and DEI are encouraged to stipulate to a scheduling order prior thereto; counsel for Hansen need not appear.

SO ORDERED.