**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**ONE 18TH CENTURY COLOMBIAN MONSTRANCE Known as the Keeper of the Host of Santa Clara, 11.3 Troy Pounds of Gold with Approximately 1,500 Precious and Semi-Precious Stones and Pearls, Defendant,**

**James W. Newton, Claimant-Appellant.**

No. 85–2643.

United States Court of Appeals,
Fifth Circuit.

Aug. 27, 1986.

Rehearing and Rehearing En Banc
Denied Oct. 22, 1986.

⬅5

Seagal V. Wheatley, Oppenheimer, Rosenberg, Kelleher & Wheatley, Leo O. Bacher, Jr., San Antonio, Tex., for James W. Newton.

James F. Fitzpatrick, Arnold & Porter, Edward L. Wolf, Washington, D.C., for amicus curiae-American Ass'n of Dealers in Ancient, Oriental and Primitive Art.

Pamela Ann Mathy, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., John F. Paniszczyn, Asst. U.S. Atty., San Antonio, Tex., for U.S.

Robert E. Goodfriend, Dallas, Tex., William T. McCue, New York City, A. Lauren Carpenter, Dallas, Tex., Donald R. Taylor, San Antonio, Tex., for Republic of Columbia.

Before RUBIN, POLITZ, and JOHNSON, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The United States seeks to forfeit property allegedly imported fraudulently by a person who has since become a fugitive from justice. The property was left in the possession of a dealer under a contract giving the dealer the right to sell the property and to retain it until the dealer had been repaid a sum deposited with the owner for that right. The issue in this case is whether the dealer has standing to contest the forfeiture. Because we find that, under the law of Texas, the state in which the contract was made and the property is situated, the dealer is neither the legal nor equitable owner of the property and because the dealer has alleged no other property interest, we affirm the judgment of the district court dismissing his claim and forfeiting the property to the United States.

### I.

A long time ago, in the eighteenth century, Don Nicolas de Burgos, a master goldsmith and jeweler to the Royal Court of Spain, traveled to Colombia where, from gold and jewels given by the devout, he made a Monstrance to be used during Mass to display the host for the religious Convent of the Sisters of Santa Clara in Tunja, Colombia. His holy work stands three feet high and is made of 11.3 troy pounds of gold (melted from 813 gold coins) and 1,500 jewels, including emeralds, pearls, amethysts, diamonds, topaz, and rubies. Its value, fixed by at least one appraisal at $3 million, is enhanced by the fact that the Sisters of Santa Clara and Don Nicholas maintained detailed records recounting how the work was commissioned, the donations collected, and the piece manufactured during the two-year period of its construction.

The Monstrance remained in the possession of the Sisters of Santa Clara for more than 200 years until, in 1978, the Sisters were forced to seek permission from their Archbishop to sell the Monstrance in order

to obtain money to repair the roof of the Convent. After the Archbishop authorized the sale, the Sisters offered the Monstrance to the Colombian National Gold Museum in Bogota. Their offer was declined, however, because that museum collects only pre-Columbian Indian art.

What happened thereafter is disputed. The parties to the dispute are Newton, a San Antonio art dealer who claims an interest in the Monstrance, and the governments of the Republic of Colombia and the United States. The two governments contend that, in October, 1978, the nuns sold the Monstrance to Carlos Manzur Aulestia, a Colombian antique dealer, for $31,250 on the condition that the treasure remain in a Colombian museum. Newton contends that Manzur did not buy the Monstrance from the nuns but was retained only to act as their agent for its sale. All parties agree, however, that in 1980, Manzur, acting either for himself or on behalf of the Sisters, offered the Monstrance to Colombia's Gold Museum in Bogota a second time, but the museum again declined to buy it. The two governments contend that thereafter, in 1981, Manzur, acting as owner, sold the Monstrance to Mr. and Mrs. Joseph Atia for $47,125 and that the Atias resold it to Edward Uhart for $110,000 even before it was delivered to them. Manzur was, therefore, asked to deliver the Monstrance to Uhart directly.

Newton contends that the Sisters had not sold the treasure either to Manzur or to the Atias but that they sold it directly to Uhart. Because Newton has not been heard on the merits, we take his version of events, although it appears to be immaterial how Uhart came to be in possession, and to claim ownership, of the Monstrance, for all agree that eventually he did buy it and, without obtaining the export permit required by Colombian law, flew with it to New York City in February 1981.

When Uhart arrived in New York, a customs broker acting on his behalf filed a Consumption Entry Packet with the United States Customs Service. The packet, which contained a "bill of sale" from Man-

zur to Uhart and a certification made by the Sisters of Santa Clara, represented that:

1. The bill of sale was authentic;

2. The bill of sale was a commercial invoice;

3. The information contained in the bill of sale (the date of the sale, the price, and the names of the seller and the buyer) was true and correct and represented an actual transaction;

4. The information contained in the "certification" of the Sisters of Santa Clara (the date of the sale, the names of the seller and buyer, the presentation to and refusal of purchase by Museum of Gold) was true and correct and represented an actual transaction;

5. The article had been exported from Spain and that the port of lading was Bogota, Spain (rather than Bogota, Colombia); and

6. The article being imported was a "chalice used in religious ceremonies."

Contending that these representations were fraudulent and misleading the United States later filed this forfeiture proceeding.

About one month after he arrived in New York, Uhart telephoned Newton, described the Monstrance, and offered to take it to San Antonio so that Newton might seek a buyer. At first Newton was not interested, but he eventually agreed to locate potential buyers. Newton, in turn, described the Monstrance to several prominent San Antonio art patrons and suggested that they buy the piece and donate it to the San Antonio Art Museum. Uhart then came to San Antonio and showed the Monstrance to prospective buyers, but no sale agreement was reached at that time.

Shortly thereafter, Uhart left San Antonio with the Monstrance and showed it to collectors in other U.S. cities. Unable to find a buyer, Uhart returned to San Antonio in the summer of 1982 and made a deal with Newton on October 29, 1982. That contract was commemorated in a writing prepared by Newton. The agreement recited that, in exchange for a "confidence de-

posit" of $200,000 paid to Uhart by Newton or his financial backers, Uhart would place the Monstrance in a San Antonio bank vault and Newton would be given one year within which to sell the Monstrance in Uhart's behalf for $1 million. For successfully completing the sale, Newhart would be paid "twenty percent of sale price with balance to be paid to Edward Uhart." If, at the end of one year, no sale had been made, the Monstrance was to be returned to Uhart in exchange for the return of the $200,000 deposit. If Uhart failed to return the deposit within 60 days after the end of the year, "the Monstrance (was to) become the property of the parties originally extending the two hundred thousand dollars." The agreement also required Uhart to produce "all original documents pertaining to the Monstrance, including those showing proof of purchase, and the legal export import into this country." In compliance with this provision, Uhart produced documentation facially appearing to satisfy these demands.

Newton hoped to obtain the $200,000 security deposit from a new group of prospective buyers, the Guthrie Group, who intended to donate the Monstrance to the San Antonio Art Museum. Due to anticipated unfavorable changes in the tax laws, however, that group abandoned its plans, leaving Newton without a prospective buyer. Newton then decided to pay up the $200,000 security deposit himself and, with the aid of guarantees from three associates, borrowed the required amount and delivered the deposit to Uhart.

On December 16, 1982, Uhart and Newton signed a "contract agreement extension," which reiterated Newton's "exclusive right to sell or place" the Monstrance. The extension agreement referred expressly to the October 29, 1982, agreement, and gave Newton the right to extend that contract for an additional year if he paid—at an unspecified time—an additional $150,000 "confidence deposit."

In mid-November, 1982, Newton showed the Monstrance to Dr. Nancy L. Kelker, Curator of Pre-Columbian and Spanish Colonial Art at the San Antonio Museum of Art, and assured her that Colombian Customs had approved the export of the Monstrance. He also advised her that, although the export requirements were "all taken care of," she should not make any inquiries on Colombia regarding the piece and should avoid giving it widespread publicity. This warning aroused Kelker's concern about the legality of the export of the Monstrance, so she made inquiries about the work both to George Syage, the Customs broker who had handled the import of the Monstrance into the United States, and to Colombia. Syage told her that the United States Customs office had no copies of any Colombian export documents. The Colombian Museum of Gold later told her that the Monstrance was taken out of Colombia clandestinely. Her concerns thus reinforced, she reported her findings to the United States Customs Service.

Acting on Kelker's report, U.S. Customs agents met Newton at the San Antonio Museum of Art, posing as potential out-of-town purchasers of the Monstrance. After discussing its export with him, the agents identified themselves and seized the Monstrance as evidence of violations of 18 U.S.C. §§ 542 and 2314 (relating, respectively, to entry of goods into the United States by means of false statements and to the transportation of stolen items in foreign commerce). Subsequently, Uhart was indicted for customs violations in connection with his importation of the Monstrance.

The United States then filed this action seeking forfeiture of the Monstrance for fraudulent importation in violation of 18 U.S.C. § 545, the text of which is set forth in the footnote.[1] Uhart cannot be located

---

**1.** Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or

Whoever fraudulently or knowingly imports or brings into the United States, any merchan-

and is apparently a fugitive from justice. In any event, he has filed no claim challenging the forfeiture. Newton and the Republic of Colombia, however, have filed verified claims seeking to challenge the forfeiture. The United States subsequently asked the district court to strike Newton's claim for lack of standing on the ground that Newton was not the owner of the Monstrance, and the court scheduled an evidentiary hearing on that issue.

At the hearing, Newton asserted an "ownership" interest in the Monstrance, contending that the $200,000 "confidence deposit" represented a down payment on his personal purchase of the work. Newton raised no other kind of claim of interest in the Monstrance and explicitly rejected all alternative characterizations of his interest as "straw men" undeserving of serious consideration. Based on the evidence presented, the district court found that, although Newton was not involved with the alleged illegal importation of the Monstrance, he also was not the legal or equitable owner of the work and, therefore, had not demonstrated an interest in the seized item sufficient to satisfy the court of his standing to contest its forfeiture.

After the dismissal of Newton's claim, the Republic of Colombia agreed to withdraw its claim and to stipulate to facts sufficient to establish probable cause for the seizure and forfeiture of the Monstrance to the United States in exchange for a promise that the United States would return the Monstrance to Colombia after it had been exhibited for three or more months in the San Antonio museum. There being no one left before the court with standing to challenge either the stipu-

lations or the forfeiture, the district court awarded the Monstrance to the United States.

## II.

 Newton's first contention is that the district court erroneously required him to prove that he possessed an interest in the Monstrance sufficient to satisfy standing requirements before demanding that the United States prove it had probable cause to seize the Monstrance. In support of the proposition he cites the rule set forth at 19 U.S.C. § 1615: "In all suits or actions ... brought for the forfeiture of any ... merchandise ... seized under the provisions of any law relating to ... the collection of duties on imports or tonnage, where the property is claimed by any person, the burden of proof shall lie upon the claimant ... *Provided*, that probable cause shall be first shown for the institution of such suit of action...." It is, however, elementary that, as a predicate to any action before a federal court, parties must establish that they have proper standing to raise a claim.[2] In the absence of a party with sufficient interest, the constitutional limitation of federal court jurisdiction to "cases or controversies" would prevent a federal court from considering the matter. Standing, therefore, is literally a threshold question for entry into a federal court, limiting the exercise of its jurisdiction, and the court must consider the standing of any party even if the issue has not been raised by the parties to the action.[3]

 This circuit has held that the burden of establishing standing to contest a forfeiture is on the claimant seeking to come

---

dise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—

 Shall be fined not more than $10,000 or imprisoned not more than five years, or both....

 Merchandise introduced into the United States in violation of this section, or the value thereof, to be recovered from any person de-

scribed in the first or second paragraph of this section, shall be forfeited to the United States....

2. *Worth v. Seldin,* 422 U.S. 490, 517–18, 95 S.Ct. 2197, 2214–15, 45 L.Ed.2d 343 (1975).

3. *Juidice v. Vail,* 430 U.S. 327, 331–32, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977); *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969).

before the court.[4] A claimant need not prove the merit of his underlying claim, but he must be able to show at least a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and "prudential considerations defining and limiting the role of the courts."[5]

■ A claimant who asserts standing to contest forfeiture of property used or imported in violation of federal law must establish that he has an ownership interest in the property subject to forfeiture.[6] Claimants holding lesser interests in the property cannot prevent forfeiture, but must await the government's acquisition of title and then apply to the Secretary of the Treasury for remission.[7] Although recognizing the general applicability of the ownership requirement, Newton advances three theories to support his standing: first, that, pending trial, he should be presumed to be the owner of the Monstrance; second, clear error in the district court's determination that he did not possess title to the Monstrance under the terms of his contract with Uhart; and third, that the concept of ownership sufficient to establish standing is broader than holding legal title.

### A.

■ To support his position that he must be presumed to be the owner of the Monstrance, Newton cites language borrowed by this Court in *United States v. $364,960 in U.S. Currency*[8] from *United States v. Wright:*[9] " 'seizure of property *from someone* is *prima facie* evidence of the person's entitlement' and ... a claimant 'need not come forward with additional evidence of ownership' unless there are 'serious reasons (presented by the Government or adverse claimants) to doubt [the claimant's] right to the property seized from him.' "[10] Newton, however, made representations to the United States—both orally and through the production of his contracts with Uhart—that raised serious doubt about whether he had acted as anything other than a broker in Uhart's behalf. The government also produced independent evidence, including the information sent to it by Kelker, to support its contention that Newton was merely a broker seeking to earn a commission on sale. Even if Newton was initially entitled by virtue of his claim to possession of the Monstrance to be presumed its owner, the government fully rebutted that presumption. The trial court, therefore, committed no error in requiring Newton to produce proof of his ownership interest.

### B.

Newton's contention that he had title to the Monstrance is founded entirely on rights that he contends he acquired both by paying Uhart a $200,000 "confidence deposit" under the terms of the October 29, 1982, contract and by signing the December 16, 1986, contract extension. He concedes that at the time the October 29, 1982, contract was signed, he was working for a commission and trying to sell the Monstrance to the Guthrie group, but he contends that he tendered the $200,000 "confidence deposit" as a down payment on his own purchase of the Monstrance when the Guthrie group abandoned its plan to buy it. At no time,

---

4. *United States v. $364,960*, 661 F.2d 319, 326 (5th Cir.1981); *United States v. $48,318.08*, 609 F.2d 210 (5th Cir.1980); *United States v. One 1967 Chris Craft, 27 foot Fiber Glass Boat*, 423 F.2d 1293, 1294 (5th Cir.1970).

5. *Worth v. Seldin*, 422 U.S. at 518, 95 S.Ct. at 2215.

6. *General Finance Corp. of Florida South v. United States*, 333 F.2d 681, 682 (5th Cir.1964); *United States v. One 1952 Model Ford Sedan Automobile*, 213 F.2d 252, 255 (5th Cir.), *cert. denied*, 348 U.S. 862, 75 S.Ct. 87, 99 L.Ed. 680 (1954);

*United States v. One 1945 Douglas C–54 (DC–4) Aircraft*, 604 F.2d 27, *after remand*, 647 F.2d 864, 866 (8th Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 294 (1984).

7. *See* cases *supra* note 5 and 19 U.S.C. § 1617.

8. 661 F.2d 319, 327 (5th Cir.1981).

9. 610 F.2d 930, 939 (D.C.Cir.1979).

10. 661 F.2d at 327 (emphasis as it originally appeared in *Wright*).

however, has he produced evidence other than his own testimony indicating that the $200,000 deposit was to serve as a down payment. Newton's receipt from Uhart merely acknowledges receipt "of the $200,-000 deposit" and states that "any rights of James W. Newton Associates" under the October contract "are transferrable and specifically assignable to a commercial bank for the purpose of obtaining the aforementioned deposit funds." The December extension, which was written the same day the confidence deposit was tendered, makes no reference to a sale of the Monstrance to Newton. Instead, it merely purports to permit an extension of the existing agreement between Newton on Uhart for an additional year in exchange for an "additional confidence deposit" of $150,000.

▮▮▮ A trial court's finding that a claimant is not the owner of property is a finding of fact, conclusive unless clearly erroneous.[11] The documents produced create only a brokerage or consignee relationship between Newton and Uhart in which Uhart remained the owner of the Monstrance and Newton paid him $200,000 in order to retain possession of the work, the right to attempt to negotiate a sale, and the opportunity to earn a commission. Nothing in the record raises serious doubt about the correctness of the district court's finding that legal title to the Monstrance was retained by Uhart.

### C.

Newton cites two Fifth Circuit opinions to support his contention that the term "ownership" as employed for the purpose of adjudging standing to contest forfeiture proceedings should be considered broader

than "title-holder." In *United States v. $47,875 in U.S. Currency*,[12] this court cited legislative history accompanying the enactment of 21 U.S.C. § 881(a)(6) (a statute different from, although similar to, the statute under which the government acted against Newton) that indicated that "the term 'owner' should be broadly construed to encompass any person with a recognized legal *or equitable* interest in the property seized."[13] He seeks further support from a quotation contained in a string-citation parenthetical in *United States v. $364,960 in U.S. Currency*,[14] which states that the right to intervene in a forfeiture proceeding extends to "any person or party having a legally recognized interest in the [seized item] whether he is owner or lienholder or whether that interest is legal or equitable in nature."[15]

Newton's reliance is misplaced. Both *$47,875* and *$364,960* involved forfeiture under 21 U.S.C. § 881(a)(6) of property used in violation of federal drug laws. In 1978, Congress amended 21 U.S.C. § 881(a)(6) to "expand the government's right of forfeiture in drug cases."[16] In partial mitigation, Congress correspondingly expanded the definition of an "owner" who could contest the forfeiture under the innocent-owner exception contained in § 881(a)(6) to include "any person with a recognizable *legal or equitable* interest in the property seized."[17] Congress, however, has not amended 18 U.S.C. § 545, the statute dealing with importation of property under which this action was brought. Even if some kind of equitable "ownership" might be sufficient to provide standing to contest forfeiture under § 545, Newton has not shown that he possesses any equitable interest in the Monstrance under Texas law.

---

11. *One 1945 Douglas C–54*, 647 F.2d at 866; Fed.R.Civ.P. 52(a).

12. 746 F.2d 291 (5th Cir.1984) (emphasis added).

13. *Id.* at 293, *citing* Joint Explanatory Statement of Titles II and III, 1978 U.S.Code Cong. & Ad. News 9496, 9522–23.

14. 661 F.2d 319 (5th Cir.1981).

15. *Id.* at 326, *citing United States v. One 1961 Cadillac Hardtop Automobile*, 207 F.Supp. 693, 698 (E.D.Tenn.1962).

16. *United States v. One 1977 Cadillac Coupe de Ville*, 644 F.2d 500, 502 (5th Cir.1981).

17. *$47,875*, 746 F.2d at 293.

His sole reliance in contending that he possesses an equitable interest in the Monstrance rests on criteria for determining standing the Eighth Circuit set forth in *One 1945 Douglas C–45.*[18] That case involved a claim of standing to contest a forfeiture under 21 U.S.C. § 881(a)(4) by a claimant who, although listed on the bill of sale and FAA registration certificate as the owner of a plane, did not exercise sufficient dominion and control over it to be its true owner. The Court of Appeals for the Eighth Circuit, consequently, affirmed the lower court's ruling that the holder of the paper title did not, under the circumstances of that case, possess an ownership interest sufficient to warrant standing to intervene in the forfeiture proceedings. Its discussion of control, possession, and financial stake to determine where the true ownership interest lay is not a basis to conclude that these criteria are each independently sufficient for determining ownership.

■ Nor is Newton's interest in the Monstrance as strong as that found by the court in *One 1945 Douglas C–45* to vest true ownership in a party lacking paper title. Newton was but a broker or consignee, and his financial stake in the Monstrance was not that of ownership but, at most, that a secured claim or a *contingent* future interest. The same evidence that has made it clear that Newton does not hold legal title to the Monstrance, thus, is more than sufficient to support a finding that he does not hold equitable title either.

### D.

■ Finally, Newton asserts that § 2.326 of the Uniform Commercial Code, which has been adopted by Texas, recognizes the type of transaction that he and Uhart entered into as a "sale or return" purchase consummated when delivery of the Monstrance was made. Section 2.326 does not purport, however, to define when a "sale or return" purchase has been made. It merely defines the rights that creditors of a party who purchases materials for resale possess in such materials. Even if the § 2.326 were generally applicable to determine when a "sale or return" purchase has been made, it would not apply to a situation like Newton's because "sale or return" purchases of art are specifically exempt from the statute's coverage.[19]

### III.

We conclude that Newton has not shown that the district court was in error in its findings of fact or in its application of legal principles to those facts. Newton, therefore, cannot challenge the agreements and stipulations entered into by the United States and Colombia following dismissal of his claim. If he had no property right, there is no basis for his charge that forfeiture of the Monstrance denied him his property without due process of law.[20] He must seek other remedies for return of his $200,000 deposit. The order of the district court dismissing Newton's claim and awarding forfeiture of the Monstrance to the United States is, therefore, AFFIRMED.

---

**18.** 647 F.2d at 866.

**19.** Tex. Bus. & Comm. Code Ann. § 2.326(c)(4) (Vernon 1968, as amended 1977).

**20.** *General Finance Corp. of Florida South v. United States,* 333 F.2d 681 (5th Cir.1964); *United States v. One 1952 Model Ford Sedan Automobile,* 213 F.2d 252, 255 (5th Cir.), *cert. denied,* 348 U.S. 862, 75 S.Ct. 87, 99 L.Ed. 680 (1954).