**UNITED STATES of America, Plaintiff,**

v.

**$3,000 IN CASH and All Monies From Certain Bank Accounts, Defendants.**

**Civ. A. No. 95–607–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Nov. 29, 1995.

gives an associate money in connection with a planned commercial real estate venture, knowing that the money will be commingled with the associate's other funds in bank accounts, is a bailor with standing to challenge the forfeiture of the associate's accounts, or merely a general creditor without such standing.

The matter is now before the Court on plaintiff's motion for summary judgment and claimants' various cross-motions for summary judgment.[1] For the reasons that follow, plaintiff's motion is granted and claimants' motions are denied.

Helen F. Fahey, United States Attorney, Gordon D. Kromberg, Assistant United States Attorney, Alexandria, Virginia, Laury L. Gordon, Trial Attorney, Asset Forfeiture/Money Laundering, Washington, DC, for plaintiff.

Charles S. Leeper, Karl N. Metzner, Rebecca E. Kuehn, Spriggs & Hollingsworth, Washington, DC, for Claimant Kurt S. Moylan.

Lawrence E. Freedman, Fairfax, Virginia, for Claimant Ihedinachi I. Uzodinma.

C. Victor Mbakpuo, Silver Spring, Maryland, for Claimant C. Victor Mbakpuo.

### MEMORANDUM OPINION

ELLIS, District Judge.

This 18 U.S.C. § 981 civil forfeiture action presents two questions concerning who qualifies as an "owner" so as to have standing to invoke the innocent-owner provision of § 981(a)(2). The first is whether one who is at once a victim and a participant in a fraud is barred by the doctrine of unclean hands from asserting an equitable interest in the money he paid in connection with the fraud. The second question is whether one who

**I**

This is a tale of audacious international fraud. It serves as a striking reminder that avarice fueled by the lure of easy money can overwhelm good judgment, with costly consequences.

In April 1994, Kurt Moylan, a Guam businessman and former Lieutenant Governor of Guam, was contacted by a person identifying himself as Dr. Benjamin Okafor from Nigeria. Okafor represented himself to be a member of the Nigerian royal family and the second-in-command of the Nigerian National Petroleum Corporation ("NNPC"), a state-owned enterprise. Okafor told Moylan that the predecessor government of Nigeria had "over-invoiced" a construction project by $20 million. Specifically, he explained that a foreign contractor had performed certain construction work for NNPC, and although the firm had billed and been fully paid $30 million, the Nigerian government had already earmarked or released a total of $50 million for the project. According to Okafor, the excess $20 million was being held in an account at the Central Bank of Nigeria ("CBN") and because the money had been designated for payment of a foreign firm, the current Nigerian government could not di-

---

1. Specifically, the following motions are before the Court:

1. Plaintiff's motion to dismiss the claims of Kurt Moylan and Victor Mbakpuo, or, in the alternative, for summary judgment on those claims;
2. Moylan's motion for partial summary judgment as to Count I;

3. Moylan's motion for a determination that 18 U.S.C. § 981 is unconstitutional;
4. Moylan's motion for partial summary judgment as to Count II; and
5. Mbakpuo's motion to dismiss, or, in the alternative, for summary judgment.

rectly access the funds. For this reason, Okafor explained to Moylan, the current Nigerian government needed the assistance of a foreign firm to retrieve the funds. And this is where Moylan, as the operator of a foreign firm, could help the Nigerian government and, not incidentally, himself. The specifics of the deal, Okafor told Moylan, were that the Nigerian government was willing to pay 40% of the $20 million to Moylan if Moylan would provide an invoice for work done to NNPC in the amount of $20 million and a bank account outside of Nigeria into which the funds could be transferred.

Moylan agreed to the proposal and submitted the requested false invoice on April 20, 1994. This invoice for $20 million stated that his company, Home Financial Corp., had erected "super propylene for Monax axial flow turbine pipes" at a Nigerian refinery, even though, as Moylan admitted in his deposition, none of his companies had ever performed such work. After submission of the false invoice, all that remained, it seemed, was for Moylan to complete the "formal application" for the funds. To this end, Moylan agreed to meet Okafor in Hong Kong in late May 1994 so that Okafor could guide him through the technicalities of the Nigerian formal application documents. In Hong Kong, for the first time, Okafor told Moylan that he would have to pay administrative fees and taxes totaling $1,350,000 before CBN would release the money. Moylan, although initially reluctant, ultimately agreed to pay the requested amount. Okafor said the payments would have to be made to an official Nigerian "money exchanger" and identified Ihedi Uzodinma in Woodbridge, Virginia as such an official. Thereafter, Moylan wired $500,000 from Guam to Uzodinma's account at NationsBank in Virginia in two installments. At Okafor's direction, Moylan wired the remaining $850,000 to an account in England in the name of another money exchanger, George Oxford. On learning the account in England was closed, Moylan wired the $850,000 to Uzodinma in Virginia.

As a result of the large transfers to Uzodinma, an agent of the Federal Bureau of Investigation ("FBI") contacted Moylan on June 20 and inquired about the transfers. In a ten minute conversation with the agent, Moylan outlined the transaction and expressed no concern regarding its legitimacy. At the time, Moylan still believed he would receive the $8 million on June 21. On the morning of June 21, Moylan received a call from Okafor who asked whether he had been contacted about the deal. Because this call followed closely on the heels of the FBI visit, Moylan began to suspect that something was amiss. That afternoon, at 3:45 p.m. in Guam, Moylan received a call from a purported employee of the National Reserve Bank in New York telling him that his money was coming. Rather than soothing Moylan's anxieties, the call further aroused his suspicions because he recognized that the call had to have been made at 1:45 a.m. New York time, a time when Federal Reserve Bank employees were unlikely to be at work. By this time, Moylan had begun to believe he had fallen victim to a fraud. He attempted to recover the money through his local banks and when those efforts failed, he contacted the FBI.

The FBI, as a result of its investigation, arrested Uzodinma in Virginia, and in June 1994 seized $1,291,128.89 in cash and bank accounts related to the fraud. The government has alleged two bases for the forfeiture of this cash. Count I alleges that Okafor used wire communications in a scheme to defraud Moylan, and that after Uzodinma received these proceeds of wire fraud, he engaged in unlawful financial transactions with them in amounts greater than $10,000, thereby rendering the money forfeitable for violations of 18 U.S.C. § 1957. Count II alleges that by wiring the $1,350,000 to Uzodinma to promote a wire fraud against NNPC, Moylan transferred or attempted to transfer the money internationally, thereby rendering it forfeitable for a violation of 18 U.S.C. § 1956(a)(2).

There are three claimants to the funds: Uzodinma, Moylan, and Victor Mbakpuo. Mbakpuo, who for purposes of these motions was wholly unaware of the fraud on Moylan, had given Uzodinma $55,000 in anticipation of joining with him in a commercial real estate joint venture. Uzodinma deposited this sum in various accounts: $30,000 in an

account with First Virginia Bank, Fairfax, Virginia and $20,000 in a Third Federal Savings and Loan account in Cleveland, Ohio, both of which accounts were seized by the government, and the remaining $5,000 in an account with Ameribanc, Annandale, Virginia, which account was not seized.

## II

■■■■ The funds in this case were seized pursuant to 18 U.S.C. § 981. Under § 981, the government bears the burden of demonstrating probable cause that a substantial connection exists between the property seized and the underlying criminal activity. *See Boas v. Smith*, 786 F.2d 605, 609 (4th Cir.1986). This showing can be made on the basis of otherwise inadmissible hearsay. *United States v. 7715 Betsy Bruce Lane*, 906 F.2d 110 (4th Cir.1990). The burden then shifts to the claimant to establish, by a preponderance of the evidence, either that the property was not involved in illegal activity, thereby rebutting the government's showing of probable cause, or that claimant did not know about or consent to the illegal activity, pursuant to the so-called "innocent-owner defense" of 18 U.S.C. § 981(a)(2). *United States v. Thomas*, 913 F.2d 1111, 1114 (4th Cir.1990).[2] But before the innocent-owner defense can be asserted, the claimant "first must demonstrate a sufficient interest in the property to give him Article III standing; otherwise there is no 'case or controversy' in the constitutional sense, capable of adjudication in the federal courts." *United States v. $38,000 in United States Currency*, 816 F.2d 1538, 1543 (11th Cir.1987).[3] To establish the requisite standing, the claimant must offer some evidence that he is an owner of the seized property. *United States v. $38,570*

*United States Currency*, 950 F.2d 1108, 1112 (5th Cir.1992).

■■■■ Congress has indicated that the "term 'owner' should be broadly interpreted to include any person with a recognizable legal or equitable interest in the property seized."[4] Even one who merely possessed the seized property might qualify as an "owner." *See, e.g., United States v. $122,043. in United States Currency*, 792 F.2d 1470 (9th Cir. 1986). But despite its liberal interpretation, "owner" does not encompass those with an undefined interest in the seized property. Specifically, an unsecured creditor generally lacks standing to challenge a forfeiture because, while that person may have an interest in the property of the debtor from whom assets were seized, she cannot show that she held an interest in the *specific* property forfeited. *See, e.g., United States v. $20,193.39 United States Currency*, 16 F.3d 344 (9th Cir.1994); *United States v. $47,875. in United States Currency*, 746 F.2d 291 (5th Cir. 1984); *United States v. $500,000*, 730 F.2d 1437 (11th Cir.1984). Finally, it is important to note that because the forfeiture statute "contains no rule for determining the scope of property rights, 'it is appropriate to refer to state law in determining the nature of the property interest' involved in a forfeiture proceeding." *United States v. Smith*, 966 F.2d 1045, 1054 n. 10 (6th Cir.1992) (quoting *United States v. Certain Real Property Located at 2525 Leroy Lane*, 910 F.2d 343, 349 (6th Cir.1990), *cert. denied*, 499 U.S. 947, 111 S.Ct. 1414, 113 L.Ed.2d 467 (1991)); *see also United States v. 1977 Porsche Carrera 911 VIN 9117201924 License No. 459 DWR*, 946 F.2d 30, 34 (5th Cir.1991).

It now remains to apply these principles to the facts of the case at bar.

---

2. The innocent-owner provision states that:
   No property shall be forfeited under this section to the extent of the interest of an owner or lienholder by reason of any act or omission established by that owner or lienholder to have been committed without the knowledge of that owner or lienholder.
   18 U.S.C. § 981(a)(2).

3. *See also United States v. One 18th Century Colombian Monstrance*, 797 F.2d 1370, 1375 (5th Cir.1989), *reh'g denied*, 802 F.2d 837 (5th Cir. 1986), *cert. denied*, 481 U.S. 1014, 107 S.Ct.

1889, 95 L.Ed.2d 496 (1987); *United States v. Real Property Located at 5201 Woodlake Dr.*, 895 F.Supp. 791, 793–94 (M.D.N.C.1995).

4. *United States v. Parcel of Real Property Known as 6109 Grubb Road, Millcreek Township Erie County, Pennsylvania*, 886 F.2d 618, 625 n. 4 (3d Cir.1989) (citing Joint Explanatory Statement of Titles II and III, 124 Cong.Rec. S17647 (October 7, 1978), *reprinted at* 1978 U.S.C.C.A.N. 9518, 9522–23 (1979)).

## III

The government contends Moylan has no standing to invoke the innocent-owner provision of 18 U.S.C. § 981(a)(2) because he is merely a general, unsecured creditor and is therefore not an "owner or lienholder" as required by the statute. *See, e.g., United States v. $20,193.39*, 16 F.3d 344 (9th Cir. 1994) (holding that unsecured creditor of business lacked standing to challenge civil forfeiture of property that government seized from business). For his part, Moylan argues, first, that he holds both legal and equitable title to the money and thus is more than a general creditor, and second, that even if he is only a general creditor, he is still an owner for purposes of the statute.

Moylan did not retain legal title to the money he transferred to Uzodinma's accounts. It is well-settled that legal title to money passes with delivery to a person who acquires it in good faith and for valuable consideration.[5] Here, the $1,350,000 was transferred to Uzodinma's NationsBank account. NationsBank accepted the transfers without knowledge of the international fraud and gave valuable consideration for the money in that it became indebted to Uzodinma for the deposited amounts. *See Alexander & Jones v. Sovran Bank (In re Nat Warren Contracting Co.)*, 905 F.2d 716 (4th Cir.1990). NationsBank, and not Moylan, therefore held legal title to the seized funds.[6]

Moylan next argues that he holds equitable title to the funds he gave to Uzodinma because he is the beneficiary of a constructive trust. Although not yet decided in this circuit, other circuits have held that claimants have standing to challenge a forfeiture on the theory that they hold equitable title to the property as a result of a constructive trust.[7] Moylan contends that because he was the victim of a fraud, he should be deemed to be the beneficiary of a constructive trust consisting of the money he gave to Uzodinma.[8] This argument fails, for the equitable remedy of a constructive trust is unavailable to Moylan because he has unclean hands.

A constructive trust arises "by construction of law, being fastened upon the conscience of him who has the legal estate, in order to prevent what would otherwise be a fraud." *In re Prime Construction Corp.*, 156 B.R. 176, 179 (Bankr.E.D.Va.1993). As an equitable doctrine, it is subject to the requirement that "[h]e who comes into equity for relief must come with clean hands." *Everett v. Bodwell*, 185 Va. 405, 38 S.E.2d 319, 320 (1946). It is well settled that courts "will not permit anyone to reap the benefits of a

---

**5.** *See, e.g., Land Oberoesterreich v. Gude*, 86 F.2d 621 (2d Cir.), *cert. denied*, 300 U.S. 663, 57 S.Ct. 493, 81 L.Ed. 871 (1936); *City of Portland v. Berry*, 86 Or.App. 376, 739 P.2d 1041 (1987); *Sinclair Houston Federal Credit Union v. Hendricks*, 268 S.W.2d 290 (Tex.Civ.App.1954).

**6.** *Met–Al, Inc. v. Hansen Storage Co.*, 828 F.Supp. 1369 (E.D.Wis.1993), cited by Moylan, is inapposite. That case involved a suit under the Federal Bill of Lading Act in which an aluminum manufacturer was defrauded by a broker who diverted shipments from the plaintiff's intended customers and failed to pay for the goods delivered. Relying on Article 2 of the Uniform Commercial Code and related case law, the court held that the manufacturer had never lost title to the aluminum. Article 2 of the U.C.C., which governs the sale of goods, simply does not apply in the context of a transfer of funds via wire transfers.

**7.** *See e.g., Torres v. $36,256.80*, 25 F.3d 1154 (2d Cir.1994) (wife had standing on the basis of a constructive trust to claim property in her husband's name on the ground that she placed the property in his name only to help him establish credit); *United States v. Marx*, 844 F.2d 1303, 1307–08 (7th Cir.1988) (claimant had standing on the basis of a constructive trust where trustee's illegal activity breached an express trust); *cf. United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1190–91 (D.C.Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995) (rejecting use of otherwise applicable constructive-trust doctrine because it conflicts with the statutory relation-back provision).

**8.** Moylan cites *United States v. Benitez*, 779 F.2d 135, 140 (2d Cir.1985), as an example of a court creating a constructive trust for the benefit of a fraud victim in a non-forfeiture context. Because the definition of "owner" for purposes of the federal forfeiture statutes incorporates state property law, *see United States v. Smith*, 966 F.2d 1045, 1054 n. 10 (6th Cir.1992); *United States v. 1977 Porsche Carrera 911 VIN 9117201924 License No. 459 DWR*, 946 F.2d 30, 34 (5th Cir. 1991), it would first be necessary to determine which state's law applied here: Virginia's, Guam's, or perhaps some other state's. Second, Moylan would have to prove that the elements necessary for the creation of a constructive trust are met here.

contract or an agreement, the carrying out of which involves his complicity in any fraudulent act, or any conduct inhibited by sound public policy." *Dye v. Dye*, 128 W.Va. 754, 39 S.E.2d 98, 107 (1946). Courts will not enforce a constructive trust in order to enable a person "to enforce a right which had grown out of a fraudulent transaction." *Ford v. Buffalo Eagle Colliery Co.*, 122 F.2d 555, 563 (4th Cir.1941).

Here, the undisputed facts in the record reflect that Moylan's hands were far from clean in this transaction.[9] It is undisputed that Moylan provided Okafor with a $20 million invoice for work that Moylan and his firm did not do in order to cause the $20 million to be released. The invoice purported to be from Home Financial Corp., one of Moylan's companies, and sought payment for the construction of super propylene for axial flow turbines for the NNPC. None of Moylan's companies had in fact done any such work, nor had they done any business at all in Nigeria. Even if Moylan believed that Okafor represented the Nigerian government, the false document was clearly intended to deceive someone. Indeed, at the hearing on this matter, counsel for Moylan conceded that the document was meant to deceive certain members of the former Nigerian regime who were still employed by the new government. Regardless of how Moylan might characterize or attempt to justify his decision, the undisputed fact remains that he submitted a false invoice in order to receive

$8 million. Submitting that false invoice was no more honest than forging an $8 million check. By any measure, this constitutes unclean hands.[10]

Nor is this the full extent of Moylan's unclean hands. In addition to providing a fraudulent invoice, Moylan provided Okafor with his corporate seal for Okafor to use in "authenticating" a forged signature purporting to be Moylan's. Moylan contends that he did not believe that his signature would be forged, but rather that CBN officials would decide whether the document was sufficient to consummate the transaction with the corporate seal alone. In his deposition, however, he testified to the contrary:

> Moylan: [Okafor said] "I'll take your corporate seal and once it's attested ..."
>
> Q: Once what's attested?
>
> Moylan: My signature. You sign it. There's a space over here that requires my signature.
>
> Q: Stop. Let me stop you a second. But you weren't going to be there to sign it.
>
> Moylan: Correct.
>
> Q: So what was going to be attested?
>
> Moylan: My signature. Whoever was going to sign it.

Moylan Dep. at 100. It seems clear that Moylan anticipated that his signature would be forged, and he provided Okafor with his seal so that the forgery could be "authenticated." Participation in the forgery bars

---

9. Moylan argues that the government has essentially admitted his ownership under Count I because there the government alleges that Moylan was defrauded by Uzodinma, that he was a victim, and that it alleged no wrongdoing on Moylan's part. This argument is unpersuasive. In Count I, the government lays claim to Uzodinma's money on the theory that the money was involved in a money laundering scheme perpetrated by Okafor. Moylan's culpability is wholly irrelevant to such a theory and the absence of any allegation of wrongdoing by Moylan in Count I does not constitute an admission on the part of the government.

10. *See, e.g., Cook v. Wolverine Stockyards Co.*, 344 Mich. 207, 73 N.W.2d 902 (1955) (submission of false documents to the state constituted unclean hands sufficient to bar a plaintiff's claim against a co-participant in the fraud); *Weller v. Weller*, 344 Mich. 614, 75 N.W.2d 34 (1956) (same).

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir.1994), is not to the contrary. There, the Second Circuit held that false invoices could not form the basis of a mail fraud conviction where defendant submitted false invoices to a company but did not intend to harm and did not in fact harm the company; rather, defendant believed that dissemblance was in the company's best interest. Even without inquiring into whether this circuit would concur with such a conclusion, the case is distinguishable in that *D'Amato* was construing the criminal intent element of the mail fraud statute, 18 U.S.C. § 1341. At issue here, on the other hand, is whether Moylan's conduct was inequitable so as to bar him from invoking the equitable power of the Court. Yet another distinction is that the *D'Amato* defendant had actually done work equal to the amount of the invoice. Only the work description was false. Here, not only was the work description false, Moylan had done no work at all.

Moylan from seeking equitable relief. *See, e.g., Sokol v. Moses,* 545 So.2d 950 (Fla.Dist. Ct.App.1989) (unclean hands precluded decedent's son from contesting will where son knowingly participated in presenting the forged will to the probate court).

These undisputed facts demonstrate that Moylan cannot seek equity for he has not "done equity." [11] Accordingly, he cannot be deemed to have an equitable interest in the seized funds.[12]

■ The remaining question with respect to Moylan is whether he has standing as a general creditor to challenge the forfeiture. In general, an unsecured creditor does not have standing to challenge a forfeiture by way of the innocent-owner provision. *See, e.g., United States v. $20,193.39,* 16 F.3d 344 (9th Cir.1994); *United States v. $47,875 in United States Currency,* 746 F.2d 291 (5th Cir.1984); *United States v. $500,000,* 730 F.2d 1437 (11th Cir.1984). Yet, this circuit has indicated the existence of a narrow exception to this general proposition. In *United States v. Reckmeyer,* 836 F.2d 200, 205–06 (4th Cir.1987), the panel addressed whether a general unsecured creditor may qualify as a third-party claimant under the continuing criminal enterprise forfeiture provision of 21 U.S.C. § 853(n)(2). The panel noted that unsecured creditors hold a legal interest in the debtor's property, but that they typically

face a substantial hurdle in making the necessary showing that they possess an interest in the *specific* property forfeited. Nonetheless, the unanimous panel, speaking through Judge Phillips, held that the petitioner in that case had overcome the hurdle because it was undisputed that *all* of the debtor's assets had been forfeited. Thus, because petitioner's interest necessarily lay within the estate, petitioner had an interest in the forfeited property.

The government seeks to distinguish *Reckmeyer* on the ground that it involved an *in personam* criminal forfeiture whereas this is a civil *in rem* proceeding. The government makes much of this distinction, but, in this context, it is a distinction without a difference, as the panel itself apparently recognized in relying on civil forfeiture cases in support of its holding. *See id.* at 206 n. 3. The heart of *Reckmeyer* is that because the debtor's entire estate was forfeited, it was certain that the general creditor's interest was within the forfeited property. That principle would seem to apply equally to both civil and criminal forfeitures, provided a debtor's entire estate has been forfeited.

Moylan argues that *Reckmeyer* is not limited to situations where the debtor's entire estate is forfeited. The point of *Reckmeyer,* Moylan contends, is that where it is possible to link the creditor's interest to the seized

---

11. The government also argues that as a matter of public policy Moylan should not be held to have standing to claim any portion of the seized funds. In the government's view, Moylan's position is analogous to that of one who, in an attempt to further an unlawful scheme, gives money to a person whom the first believes to have the same illicit goal, only to find that the recipient is a government agent who has confiscated his money. The government cites several cases for the proposition that, in such circumstances, the payor cannot obtain a refund of the money that was seized. *See, e.g., United States v. Smith,* 659 F.2d 97 (8th Cir.1981) (money paid to undercover agent in drug deal held not recoverable); *United States v. Farrell,* 606 F.2d 1341 (D.C.Cir.1979) (same); *United States v. Kim,* 738 F.Supp. 1002, 1004 (E.D.Va.1990) (money paid as an illegal gratuity to a government official is not recoverable). Because Moylan's unclean hands bar him from asserting an equitable interest in the funds and hence from having standing to claim the funds, it is not necessary to decide whether a public policy doctrine might require the same result.

12. The government argues alternatively that quite apart from the clean-hands doctrine, the relation-back doctrine bars creation of a constructive trust here, and in support cites *United States v. BCCI Holdings (Luxembourg), S.A.,* 46 F.3d 1185, 1190–91 (D.C.Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995), where this reasoning was adopted. Yet, the forfeiture scheme at issue in *BCCI* differs from that at issue here. In BCCI, the property had already been forfeited and the claimants were seeking its return. In the case at bar, on the other hand, a forfeiture order has not yet been entered, and so the relation-back doctrine has not yet taken effect. *See United States v. A Parcel of Land, Buildings, Appurtenances and Improvements Known as 92 Buena Vista Avenue, Rumson, New Jersey,* 507 U.S. 111, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993) (holding that the relation-back doctrine does not apply until a forfeiture order is entered by a court). Accordingly, the reasoning of *BCCI* does not apply to this case.

property, the creditor has standing to challenge the forfeiture. In *Reckmeyer*, that link was possible because the debtor's entire estate was forfeited. Here, Moylan argues, he can link his claim to the seized assets either by tracing the money he gave Uzodinma into the various seized accounts, or by reasoning that, pursuant to Count I of the Complaint, the assets are subject to forfeiture because of the fraud on Moylan, so Moylan has an interest in all seized funds.

This expansive reading of *Reckmeyer* must be rejected. In no reported case has an unsecured creditor been allowed to challenge a forfeiture apart from showing a legal, equitable, or possessory interest in the seized property. Specifically, no unsecured creditor has been permitted to trace the loaned funds to a particular seized asset. In considering Moylan's suggested expansive reading, it is also important to note that other circuits have rejected *Reckmeyer*, either more or less explicitly.[13] Given this criticism, and that *Reckmeyer* has not been explicitly reaffirmed in light of that criticism, it would seem prudent to limit Reckmeyer to its particular facts.

Thus, if Uzodinma were shown to have forfeited his entire estate, *Reckmeyer* might provide Moylan standing to challenge the forfeiture pursuant to 18 U.S.C. § 981(a)(2). It is undisputed, however, that Uzodinma still retains numerous assets: bank accounts and property in Nigeria, a house in Cleveland, and a car, at least. *Reckmeyer*, then, does not save the day for Moylan, and as a general creditor, he is without standing to challenge the forfeiture of the seized assets. Moylan must pursue other means of recovering his money. He may, for example, have a cause of action in tort against Uzodinma.

Also, if he believes that as a victim of the fraud he deserves the money seized from Uzodinma, he may file a petition for remission of forfeited property with the Attorney General. *See* 28 C.F.R. §§ 8.10, 9.3 (1995).[14]

## IV

█ Also at issue is the standing of Mbakpuo. It is undisputed that Mbakpuo gave Uzodinma a total of $55,000 in anticipation of their joint commercial real estate venture. The government contends that the transfer is properly characterized as a loan and Mbakpuo is therefore nothing more than an unsecured creditor, without standing to claim the seized money. Mbakpuo argues that he is a bailor of the funds and that he therefore retained title to the money and should be allowed to trace his payments to the seized funds.

█ Whether Mbakpuo should be considered a bailor or a creditor turns on the intent of Mbakpuo and Uzodinma in entering into the transaction, as manifested by their conduct and statements and any other relevant evidence. *See Reherd's Adm'r v. Clem*, 86 Va. 374, 10 S.E. 504 (1889). This principle, coupled with a review of the record as a whole, points convincingly to the conclusion that Mbakpuo is a creditor, not a bailor.

First, deposition testimony of Mbakpuo and Uzodinma indicates that the two viewed Mbakpuo as a creditor rather than a bailor. Thus, Mbakpuo stated that he did not know into which account or accounts Uzodinma would deposit the money, nor did it seem to matter to Mbakpuo. In other words, Mbakpuo expected that the money would be commingled with Uzodinma's money, not segregated as in a bailment. In Mbakpuo's own

13. *See United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1191–92 (D.C.Cir. 1995) (explicitly rejecting *Reckmeyer*); *United States v. $20,193.39*, 16 F.3d 344, 346–47 (9th Cir.1994) (distinguishing and criticizing *Reckmeyer*); *United States v. Schwimmer*, 968 F.2d 1570, 1581 (2d Cir.1992) (explicitly rejecting *Reckmeyer*).

14. In one of his cross-motions for summary judgment, Moylan argues that 18 U.S.C. § 981 is unconstitutional as it applies to him in Count II. He contends that the forfeiture under Count II constitutes punishment and, given that, the standard of proof the government must meet to cause a forfeiture—probable cause—is too low to comport with Due Process. The government responds that forfeiture pursuant to section 981 is not punishment, and that even if it is, the probable cause standard provides Moylan all the process constitutionally due him. In light of the conclusion that Moylan is without standing to contest the forfeiture, he is likewise without standing to dispute the constitutionality of the forfeiture scheme. Accordingly, the Court is without jurisdiction to address that claim.

words, "Money is money, you know, and he can deposit money from several sources into one account, you know." Mbakpuo Dep. at 34. Moreover, Mbakpuo apparently viewed himself as a creditor of Uzodinma, with the latter being indebted to him in the amount of $55,000. When asked whether he placed any restrictions on Uzodinma regarding what he could do with the money, Mbakpuo replied, "No, I did not place any restrictions. As far as I know—well, let me answer the question that you did ask. I mentioned before, I knew that he had a home in Cleveland. All I have to do is drag his behind in Court and sell the realty off.... I knew that on demand I would get it...." Mbakpuo Dep. at 31–32. Uzodinma's deposition testimony similarly reflects that he saw himself as indebted to Mbakpuo for $55,000 and that he did not identify any particular monies as belonging to Mbakpuo. Rather, when Mbakpuo demanded the money, he intended simply to repay Mbakpuo from whatever account or accounts he deemed convenient.[15]

■■■ Second, the conclusion that Mbakpuo is a creditor rather than a bailor comports with cases regarding the deposit of money in a bank. In those cases, the presumption is that "funds deposited in a general account immediately become the property of the bank and the bank becomes a debtor of the depositor." *Alexander & Jones v. Sovran Bank (In re Nat Warren Contracting Co.)*, 905 F.2d 716 (4th Cir.1990). A depositor may be a bailor if the deposit is a "special" one, which requires that the money be kept in a separate account and not commingled with other funds. *See Bernardini v. Central Nat'l Bank of Richmond*, 223 Va. 519, 290 S.E.2d 863 (1982) (holding that when special funds were commingled with other deposits the entire sum became the property of the bank). Here, Mbakpuo neither intended nor expected to have returned to him the very same money he transferred to Uzodinma. Indeed he could not have had this intention or expectation since he paid by check. Nor was the money kept in a special account. Rather, the money was deposited in various of Uzodinma's personal accounts

and was commingled with Uzodinma's other money, including—unfortunately for Mbakpuo—money from Moylan. Giving Uzodinma money to hold was tantamount to depositing the funds in a bank, making Mbakpuo a creditor rather than a bailor.

Finally, Mbakpuo claims he gave the money to Uzodinma in anticipation of a joint commercial real estate venture. In so doing, he merely made a business investment, not a bailment. Unless that investment matured into some form of legal or equitable interest in some property, Mbakpuo cannot be an owner of any specific property. *Cf. United States v. $47,875*, 746 F.2d 291 (5th Cir.1984) (finding that claimants who gave money to drug purchaser whose assets were forfeited for the purpose of financing a joint venture were not owners because the state-law requirements for the formation of a joint venture were not met.)

In sum, because Mbakpuo is a creditor rather than a bailor, he lacks standing to claim any portion of the seized assets and his claim must be dismissed. At oral argument, Mbakpuo recited an African saying that when two elephants fight, the grass suffers. Mbakpuo likened himself to the grass in this fight between the government and the fraud participants. Even though Mbakpuo is not entitled to assert the innocent-owner defense, the grass may yet survive the trampling it has suffered: Uzodinma appears to be indebted to Mbakpuo in the amount of $55,000, and Mbakpuo must seek repayment from Uzodinma directly.

An appropriate order will issue.

---

**15.** Uzodinma testified that "[W]hatever I deposit in the account makes no difference where I have to deposit this money. I deposited it according to what I want, so which means, whenever our business comes up, I bring the money from whatever account I want." Uzodinma Dep. at 129.